**F I L E D**
United States Court of Appeals
Tenth Circuit

MAR 3 1998

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF UTAH, UTAH SCHOOL
AND INSTITUTIONAL TRUST
LANDS ADMINISTRATION and
UTAH ASSOCIATION OF
COUNTIES,

        Plaintiffs-Appellees,

v.

BRUCE BABBITT, in his official
capacity as SECRETARY OF THE
INTERIOR; UNITED STATES
DEPARTMENT OF THE INTERIOR;
SYLVIA V. BACA, in her official
capacity as ACTING DIRECTOR OF
THE BUREAU OF LAND
MANAGEMENT; UNITED STATES
BUREAU OF LAND
MANAGEMENT,

        Defendants-Appellants,

--------------------------------

SOUTHERN UTAH WILDERNESS
ALLIANCE; SIERRA CLUB;
NATURAL RESOURCES DEFENSE
COUNCIL; WILDERNESS SOCIETY,

        Amici-Curiae.

No. 97-4015

Appeal from the United States District Court
for the District of Utah
(D.C. No. 96-CV-870)

Lisa E. Jones, Department of Justice, Washington, D.C. (Gary B. Randall and John A. Bryson, Department of Justice; Paul Smyth, Wendy Dorman and David Grayson, U.S. Department of the Interior, Office of the Solicitor; Lois J. Schiffer, Assistant Attorney General; Scott M. Matheson, Jr., United States Attorney, and Stephen J. Sorenson, Assistant United States Attorney, Salt Lake City, Utah, with her on the briefs), for Defendants-Appellants.

Constance E. Brooks, C. E. Brooks & Associates, Denver, Colorado (Michael B. Marinovich, C. E. Brooks & Associates, Denver, Colorado; Jan Graham, Attorney General for the State of Utah, and Stephen G. Boyden, Assistant Attorney General, State of Utah, Salt Lake City, Utah; Ronald W. Thompson and Stephen H. Urquhart, Thompson & Associates, St. George, Utah; John W. Andrews, Special Assistant Attorney General for the Utah School and Institutional Trust Lands Administration, Salt Lake City, Utah, with her on the briefs), for Plaintiffs-Appellees.

Heidi J. McIntosh, Southern Utah Wilderness Alliance, Salt Lake City, Utah, (Robert B. Wiygul, Sierra Club Legal Defense Fund, Denver, Colorado, with her on the brief), filed an amicus curiae brief for Sierra Club Legal Defense Fund, Natural Resources Defense Council, and Southern Utah Wilderness Alliance.

Before **MURPHY, LOGAN,** Circuit Judges, and **MILES-LaGRANGE***, District Judge.

**MURPHY**, Circuit Judge.

---

*Honorable Vicki Miles-LaGrange, District Judge for the Western District of Oklahoma, sitting by designation.

This case arises from Department of the Interior Secretary Bruce Babbitt's decision to inventory certain public lands in Utah for wilderness characteristics. Defendants appeal from the issuance of a preliminary injunction by the district court on November 15, 1996, enjoining Defendants from proceeding further with the inventory. We exercise jurisdiction under 28 U.S.C. § 1292(a)(1). Because we conclude that Plaintiffs lack standing to challenge the inventory, we vacate the preliminary injunction and remand with instructions to dismiss the seven causes of action directly related to the inventory and to further consider Plaintiffs' sixth cause of action, the only cause of action not directly related to the inventory.

## I. BACKGROUND

### A. Summary of Utah Wilderness Debate

A brief review of the history of the wilderness debate in Utah is necessary to put the facts of this case into context. In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA") to, among other things, "[e]stablish a mission for the public lands administered by the Secretary of the Interior through the Bureau of Land Management" ("BLM"). H.R. Rep. No. 94-1163, at 431 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175, 6176. These public lands comprise approximately one-fifth of the nation's land and are primarily located in eleven western states and Alaska. *See id.*

FLPMA § 201 requires the Secretary of the Department of Interior ("Secretary") to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values." 43 U.S.C. § 1711(a). FLPMA § 603 ordered the Secretary to review within fifteen years certain "roadless areas of five thousand acres or more" and report to the President recommendations concerning the "suitability or nonsuitability" of each area for preservation as wilderness.[1] 43 U.S.C. § 1782(a). Within two years after receiving the Secretary's recommendations, the President was to advise Congress of his recommendations. *See id.* § 1782(b). An Act of Congress is necessary to designate public lands as wilderness. *See id.*

---

[1]The definition of "wilderness" is taken from the Wilderness Act of 1964, which defines "wilderness" as

> an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean ... an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

Soon after FLPMA was enacted, BLM began its nationwide wilderness review program in accordance with the Wilderness Inventory Handbook ("WIH"), which was adopted to standardize the FLPMA § 603 process. *See* BLM, U.S. Dep't of the Interior, *Wilderness Inventory Handbook* 3 (1978) [hereinafter WIH]. The review proceeded in three stages: (1) the "inventory" phase, consisting of (a) an "initial inventory" to identify "wilderness inventory units," which were defined as roadless areas of 5000 acres or more that may have wilderness characteristics, and (b) an "intensive inventory" of these units to determine whether the units possessed wilderness characteristics and, if so, designation of the units as "wilderness study areas" ("WSAs"); (2) the "study" phase, during which WSAs were studied to determine whether the lands were suitable for designation as wilderness; and (3) the "reporting" phase, consisting of the Secretary's recommendations to the President and the President's recommendations to Congress. WIH, *supra*, at 3, 9-11; *see also Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 740 (10th Cir. 1982) (discussing § 603 wilderness review process). FLPMA § 603 directed the Secretary to "manage [the lands subject to the wilderness review process] ... so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). To implement this

directive, BLM adopted the Interim Management Policy and Guidelines for Lands Under Wilderness Review ("IMP").[2] *See Rocky Mountain Oil*, 696 F.2d at 739.

BLM initially reviewed approximately 22 million acres of federal public lands in Utah and identified approximately 14.5 million acres that "clearly and obviously" did not contain wilderness characteristics. *See* 44 Fed. Reg. 46,541 (1979). BLM subsequently conducted an intensive inventory of approximately 5.2 million acres to determine the presence or absence of wilderness characteristics. *See* 45 Fed. Reg. 20,576 (1980); 45 Fed. Reg. 27,831 (1980). In 1980, BLM completed the inventory phase of the § 603 wilderness review process for public lands in Utah and, after a public comment period, published its final inventory decision designating approximately 2.5 million acres as WSAs. *See* 45 Fed. Reg. 75,602 (1980). In 1991, after lengthy administrative appeals,[3] then-Secretary Manuel Lujan, Jr. recommended to President George Bush that approximately 1.9 million acres be designated as wilderness. *See* BLM, U.S. Dep't of the Interior,

---

[2]The lands subject to the FLPMA § 603 review process are managed under the IMP until Congress designates the lands as wilderness or the lands are released from further wilderness consideration. *See Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 740 (10th Cir. 1982) (discussing § 603 wilderness review process).

[3]*See, e.g.*, Decision on Protests, 46 Fed. Reg. 15,332 (1981); *Utah Wilderness Ass'n*, 72 I.B.L.A. 125 (1983) (appealing BLM decision involving approximately 925,000 acres of public lands); Decision on Reassessment of Units Set Aside and Remanded by I.B.L.A., 48 Fed. Reg. 46,858 (1983); *Utah Wilderness Ass'n*, 86 I.B.L.A. 89 (1985) (appealing BLM's reassessment with respect to approximately 250,000 acres).

*Utah Statewide Wilderness Study Report* 3 (1991).  Shortly thereafter, President

Bush forwarded the 1.9 million acre recommendation to Congress.  Although

various groups, including the Utah congressional delegation, have supported

legislation to designate federal lands in Utah as wilderness,[4] Congress has not yet

passed any such legislation.

## B.  1996 Inventory

On July 24, 1996, Secretary Babbitt sent a letter to Utah Congressman

James Hansen acknowledging the "stalemate" on the Utah wilderness issue and

informing him that "a small team of career professionals, who have substantial

expertise in addressing wilderness issues in Utah and elsewhere," were going to

"take a careful look at the lands identified in the 5.7 million acre bill [H.R. 1500]

that have not been identified by the BLM as wilderness study areas, and report

---

[4]In 1995, Utah Representatives James Hansen and Enid Greene sponsored H.R. 1745, which would have designated approximately 2.1 million acres of federal lands in Utah as wilderness.  Utah Senators Orrin Hatch and Robert Bennett introduced a similar bill, S. 884, in the Senate.  Various environmental groups supported H.R. 1500, which would have designated approximately 5.7 million acres as wilderness.  H.R. 1500, which has been introduced every year since 1989, was sponsored in 1995 by New York Representative Maurice Hinchey.  None of the 1995 bills passed.  In 1997, Utah Representative Chris Cannon sponsored H.R. 1952, which would designate approximately 2.1 million acres as wilderness.  H.R. 1500 was again introduced by Representative Hinchey, along with its Senate counterpart, S. 773, sponsored by Illinois Senator Richard Durbin.  To date, none of the 1997 bills have passed.

their findings."[5]  Letter from Bruce Babbitt, Secretary of the Interior, to James V. Hansen, Chairman, Subcommittee on National Parks, Forests, and Public Lands 2 (July 24, 1996).  Babbitt noted the team was "explicitly instructed to apply the same legal criteria that were used in the original inventory" and estimated the work would be completed within six months.  *Id.*

Although Representative Hansen, along with Utah Senators Orrin Hatch and Robert Bennett, strongly opposed Babbitt's plan to "re-inventory" federal lands in Utah,[6] the BLM team began its inventory fieldwork in September 1996. The team proceeded with the inventory in accordance with the Utah Wilderness Review Procedures ("1996 Procedures"), which were adopted by BLM specifically for purposes of the 1996 inventory and which incorporated various provisions of the WIH.

According to the Defendants in this action, the sole purpose of the 1996 inventory is to identify the presence or absence of wilderness characteristics on the public lands.  They assert the report based on the inventory will not contain any recommendations concerning the suitability or unsuitability of the lands for

---

[5]According to Robert V. Abbey, project leader for the 1996 inventory, the inventory was to include fieldwork, review of resource data from recent aerial photography, and review of information generated in prior federal and state reviews and public hearings on the public lands in Utah.

[6]*See* Letter from James V. Hansen, Orrin G. Hatch, & Robert F. Bennett to Bruce Babbitt, Secretary of the Interior (Aug. 1, 1996).

management as wilderness and neither the inventory nor the report will affect the management of the public lands. Babbitt has consistently maintained that once he reviews the results of the inventory, he will make the report public and determine what further action, if any, will be taken.

## C. Proceedings Below

In October 1996, the State of Utah, the Utah School and Institutional Trust Lands Administration, and the Utah Association of Counties (collectively, "Plaintiffs") filed suit in federal district court challenging the 1996 inventory on various grounds and seeking to enjoin the Secretary and BLM from proceeding with the inventory. Plaintiffs named as Defendants the Department of Interior; Babbitt, in his official capacity as Secretary; BLM; and Michael Dombeck, in his official capacity as acting director of BLM (collectively, "Defendants").

Plaintiffs alleged the following eight causes of action: (1) unauthorized inclusion of state trust lands in the lands being inventoried; (2) arbitrary and unequal treatment of Utah, in violation of the U.S. Constitution; (3) conducting the inventory without authority; (4) failure to provide for public involvement in the inventory, in violation of FLPMA; (5) failure to follow rule-making procedures when promulgating the 1996 Procedures, in violation of FLPMA; (6) de facto wilderness management of non-WSA federal lands, in violation of FLPMA; (7) arbitrary change in interpretation of FLPMA and the WIH; and (8)

failure to prepare an environmental impact statement ("EIS"), in violation of the National Environmental Policy Act ("NEPA"). Plaintiffs further alleged generally that Defendants' actions exceeded their statutory authority and were arbitrary and capricious, and should therefore be declared unlawful and set aside under the Administrative Procedure Act ("APA").

In their Complaint, Plaintiffs requested the following relief: (1) a declaration that Defendants have no authority to conduct the inventory or adopt the 1996 Procedures; (2) a declaration that Defendants' inclusion of state trust lands in the inventory violates the Utah Enabling Act of 1894, FLPMA, and the U.S. Constitution; (3) a declaration that Defendants' adoption of the 1996 Procedures and their implementation of the inventory violates FLPMA; (4) a declaration that Defendants' imposition of different review criteria and procedures for public lands in Utah violates the Utah Enabling Act of 1894, FLPMA, and the U.S. Constitution; (5) a declaration that the inventory is a "major federal action that may significantly affect the environment," necessitating preparation of an EIS; (6) an injunction prohibiting Defendants from taking any action in connection with the inventory until they have complied with FLPMA and NEPA; (7) an injunction prohibiting Defendants from imposing a de facto wilderness management standard on non-WSA federal lands until such time as they comply with FLPMA; (8) an injunction prohibiting Defendants from making

any use of information gathered during the inventory process; and (9) an award of attorney fees and costs to the extent permitted by law.

Approximately three weeks after Plaintiffs filed their Complaint, they filed a motion seeking a temporary restraining order and preliminary injunction, asking the district court to enjoin Defendants from completing the inventory and from using information gathered during the inventory process.[7] Plaintiffs relied on three arguments to support their motion: (1) Defendants violated FLPMA by failing to allow public involvement in the inventory process; (2) Defendants violated the APA and FLPMA by failing to allow public comment before adopting the 1996 Procedures; and (3) Defendants had no authority to include state trust lands in the inventory.

Defendants responded to Plaintiffs' motion by arguing (1) Plaintiffs would not suffer any irreparable injury if their motion was denied; (2) the case was not ripe for review, as there was no "final agency action" for purposes of proceeding under the APA; and (3) Plaintiffs could not show a likelihood of success on the merits because the inventory did not require public participation, adoption of the

---

[7]A party seeking a preliminary injunction must show the following: (1) that it will suffer an irreparable injury absent an injunction; (2) that the threatened injury outweighs the harm an injunction may cause the opposing party; (3) that an injunction would not be adverse to the public interest; and (4) that it is substantially likely to prevail on the merits. *See Elam Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1346-47 (10th Cir. 1997).

1996 Procedures did not require informal rule-making, and the Procedures were not arbitrary or capricious.

After a hearing, the district court granted Plaintiffs' motion and enjoined Defendants from proceeding with the inventory. The court first concluded Plaintiffs were likely to prevail on their legal claims. The court determined that neither FLPMA § 201 nor FLPMA § 603 authorized the inventory. The court then noted that even if § 201 did authorize the inventory, Defendants violated the section by failing to allow public participation. Next, the court concluded that Plaintiffs would be irreparably harmed absent a preliminary injunction. The court stated that "[i]f the Plaintiffs are denied involvement from the earliest stages of the reinventory procedure, they may well be placed at a serious disadvantage in challenging the factual basis for the reinventory results once the process is complete." The court acknowledged, however, that "it is not presently known what the results of the reinventory will be or for that matter whether the Plaintiffs will disagree with those results." Nevertheless, the court found that the "offer of public comment after the process is complete cannot [remedy] the advantage Defendants would gain by developing inventory criteria and conducting the inventory without public scrutiny." Finally, the court concluded that the balance

of interests favored the issuance of an injunction.[8] The district court therefore enjoined Defendants "from further work on the Utah Wilderness Review until this case is finally adjudicated on its merits."

Defendants appeal the district court's order enjoining them from completing the 1996 inventory and argue that Plaintiffs' claims should be dismissed for lack of standing and ripeness. In the alternative, Defendants argue the district court abused its discretion in granting the preliminary injunction because Plaintiffs cannot show a likelihood of success on the merits. In support of this alternative position, Defendants assert that BLM is authorized to conduct the inventory, that no public participation is required during the inventory process, and that the balance of hardships compels denial of injunctive relief.

## II. DISCUSSION

### A. Standing Requirements

Defendants challenge the district court's jurisdiction by attacking Plaintiffs' standing to bring their claims.[9] The requirement of standing "'involves

---

[8]The court did not address Defendants' claim that the case was not ripe for review.

[9]We note that approximately 45 days after oral argument in the appeal of this case, Plaintiffs filed a Motion to Remand to the District Court for the Jurisdictional Issues of Standing, Ripeness, and Final Agency Action. In arguing that this court should remand to the district court, Plaintiffs noted they were granted leave to amend and supplement the Complaint to add an ultra vires claim, which affected the standing analysis. Plaintiffs also argued they had uncovered documents during formal discovery which provided additional support for their

both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 117 S. Ct. 1154, 1161 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The notion of standing is grounded in Article III of the U.S. Constitution, which restricts federal court adjudication to actual cases or controversies. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrinal foundation of Article III standing is the principle of separation of powers. *See id.* at 750-52.

Standing is but one of several gatekeepers "'founded in concern about the proper--and properly limited--role of the courts in a democratic society.'" *Id.* at 750 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

> "All of the doctrines that cluster about Article III--not only standing but mootness, ripeness, political question, and the like--relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."

*Id.* (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178-79 (1983) (Bork, J., concurring)).

---

allegations of injury-in-fact. Plaintiffs additionally noted they had recently responded to Defendants' motion to dismiss in the district court, which was their first opportunity to fully address the standing issue. Defendants opposed the motion, arguing the standing issue had been fully briefed and argued in this appeal. This court denied Plaintiffs' motion. Plaintiffs' amended Complaint is not before us. We therefore consider only the allegations in Plaintiffs' original Complaint.

Because Plaintiffs have invoked Article III jurisdiction to challenge the conduct of the executive branch of government, the necessity of a case or controversy is of particular import. *See Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 804 (11th Cir. 1993). The warnings against unrestrained exercise of the power of judicial review over the conduct of the executive or congressional branches by relaxation of the standing requirements are numerous and dire. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473-74 (1982); *United States v. Richardson*, 418 U.S. 166, 188-93 (1974) (Powell, J., concurring). Restraint in the exercise of judicial review preserves not only the power and vitality of the judiciary, but that of each of the other two coordinate branches of federal government as well. *See Valley Forge*, 454 U.S. at 474; *Richardson*, 418 U.S. at 188-89. Standing to invoke the power of the federal courts is not a mere technical hoop through which every plaintiff must pass, but rather is "a part of the basic charter promulgated by the Framers of the Constitution." *Valley Forge*, 454 U.S. at 476.

These principles of constitutional governance mandate strict compliance with the standing requirement. *See Raines v. Byrd*, 117 S. Ct. 2312, 2317 (1997). Standing is not measured by the intensity of a party's commitment, fervor, or aggression in pursuit of its alleged right and remedy. *See Doremus v. Board of*

*Educ.*, 342 U.S. 429, 434-35 (1952); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 225-26 (1974); *Valley Forge*, 454 U.S. at 485-86; *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Nor is the perceived importance of the asserted right a substitute for constitutional standing. *See Valley Forge*, 454 U.S. at 484-85. The argument that no other person is better suited to bring the lawsuit is equally unavailing. *See id.* at 489 ("'[T]he assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing.'" (quoting *Schlesinger*, 418 U.S. at 227)). Notwithstanding its prominent gatekeeping role, the standing requirement of Article III should never be interpreted to bar a party properly before the court from invoking the power of judicial review.

To satisfy the standing requirement of Article III, Plaintiffs must demonstrate the following:

> (1) that the plaintiff[s] have suffered an "injury in fact"--an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [is] a causal connection between the injury and the conduct complained of--the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett*, 117 S. Ct. at 1163 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Phelps v. Hamilton*, 122 F.3d 1309, 1316 (10th Cir.

1997). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The burden is therefore on Plaintiffs "'clearly to allege facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute.'" *United States v. Hays*, 515 U.S. 737, 743 (1995) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"In addition to the immutable requirements of Article III, 'the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.'" *Bennett*, 117 S. Ct. at 1161 (quoting *Valley Forge*, 454 U.S. at 474-75). These prudential principles include "the general prohibition on a litigant's raising another person's legal rights [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen*, 468 U.S. at 751. "[U]nlike their constitutional counterparts, [these prudential requirements] can be modified or abrogated by Congress." *Bennett*, 117 S. Ct. at 1161.

Because neither FLPMA nor NEPA provide for a private right of action, Plaintiffs rely on the judicial review provisions of the APA[10] in bringing their

---

[10]Section 10(a) of the APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further provides:

Agency action made reviewable by statute and final agency action for

claims. *Cf. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (noting that plaintiffs did not contend that FLPMA and NEPA provide a private right of action and that plaintiffs were proceeding under the APA). Consequently, in addition to the Article III standing requirements,[11] Plaintiffs must also meet the statutory standing requirements of the APA: Plaintiffs must show there has been some "final agency action" and must "demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims." *Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996).

Defendants argue that Plaintiffs lack Article III standing because they cannot show an injury-in-fact flowing from the 1996 inventory.[12] Defendants also

---

which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

*Id.* § 704.

[11]"Neither the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.24 (1982).

[12]In opposing Plaintiffs' motion for a preliminary injunction in the district court, Defendants did not argue that Plaintiffs lacked standing because they failed to show an injury-in-fact from the 1996 inventory. Defendants did, however, argue that Plaintiffs failed to show some "final agency action" for purposes of proceeding under the APA. Closely related to the injury-in-fact argument, Defendants also argued that Plaintiffs had not shown they would suffer an "irreparable" injury in the absence of an injunction.

argue that Plaintiffs lack standing under the APA because the inventory does not constitute a "final agency action" and because Plaintiffs cannot show they are "aggrieved" within the meaning of the APA. *See* 5 U.S.C. §§ 704, 702. This court reviews questions of standing de novo. *See Catron County*, 75 F.3d at 1433. Because "[c]ase-or-controversy considerations ... 'obviously shade into those determining whether the complaint states a sound basis for equitable relief[,]' [t]he latter set of considerations ... inform our judgment about whether [Plaintiffs] have standing." *Allen*, 468 U.S. at 760-61 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)).

"'[S]tanding jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.'" *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992) (quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 703-04 (D.C. Cir. 1988)). After carefully reviewing the allegations in Plaintiffs' Complaint, this court concludes that seven of the eight

Standing is "jurisdictional in nature," and "we are obligated to satisfy ourselves as to our own jurisdiction at every stage of the proceeding." *Alexander v. Anheuser-Busch Cos.*, 990 F.2d 536, 538 (10th Cir. 1993). Therefore, Defendants' failure to argue before the district court that Plaintiffs lacked standing because they could show no injury-in-fact does not bar our considering the argument at this time. *See, e.g.*, *Joslin v. Secretary of Dep't of Treasury*, 832 F.2d 132, 134 (10th Cir. 1987); *Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980).

causes of action relate directly to the 1996 inventory.[13] The only cause of action

not directly related to Defendants' decision to conduct the inventory is Plaintiffs'

sixth cause of action, claiming that Defendants are currently imposing a de facto

wilderness management standard on non-WSA federal lands, in violation of

FLPMA.

Although Plaintiffs have alleged eight causes of action, they have not

alleged a distinct identifiable injury for each cause of action. A thorough review

of the allegations in Plaintiffs' Complaint and the arguments in their appellate

_____

[13]In their briefs on appeal, both parties have focused on the 1996 inventory and have generally treated all the causes of action as flowing from the inventory. A close reading of Plaintiffs' Complaint, however, reveals that Plaintiffs' sixth cause of action, their claim that Defendants are currently imposing a de facto wilderness management standard on non-WSA federal lands in violation of FLPMA, does not stem from Defendants' decision to conduct the inventory. The remaining seven causes of action, however, all relate directly to the 1996 inventory.

The first cause of action challenges the inclusion of state trust lands in the lands being inventoried. In the second cause of action, Plaintiffs claim that Defendants have unlawfully singled out the State of Utah for "unique and special study." In the third cause of action, Plaintiffs claim that Defendants do not have authority to conduct the inventory, and in the fourth cause of action, Plaintiffs assert that Defendants have violated FLPMA by failing to allow public participation in the inventory process. The fifth cause of action challenges the promulgation of the 1996 Procedures. In the seventh cause of action, Plaintiffs claim that because Defendants arbitrarily changed their interpretation of FLPMA and the WIH, both Defendants' decision to conduct the inventory and the 1996 Procedures are arbitrary and capricious and should thus be set aside. Finally, in the eighth cause of action, Plaintiffs assert the inventory constitutes a major federal action that may significantly affect the environment, necessitating preparation of an EIS.

brief reveals that Plaintiffs essentially allege five types of injury with respect to all their causes of action: (1) Plaintiffs have generally been injured by Defendants' acting in contravention of the law; (2) Plaintiffs have been injured by denial of their right to participate in the inventory process; (3) Plaintiffs have been injured by Defendants' imposition of a de facto wilderness management standard on non-WSA federal lands, formalization of which is imminent due to the 1996 inventory; (4) Plaintiffs have been injured by denial of their opportunity to comment on whether the lands included in the inventory are "roadless" and by Defendants' changes to their road maintenance policies; and (5) Plaintiffs have been injured by Defendants' failure to prepare an EIS. Analysis of each alleged injury is necessary to determine whether Plaintiffs have met their burden of establishing the "irreducible constitutional minimum" of standing: that they suffered an "injury-in-fact," i.e., an invasion of a "judicially cognizable interest," which is "fairly traceable" to Defendants' conduct and which will "likely be redressed by a favorable decision." *Bennett*, 117 S. Ct. at 1161.

## B. Standing to Challenge 1996 Inventory

Preliminarily, we note that "[the elements of constitutional standing] are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case." *Defenders of Wildlife*, 504 U.S. at 561. Consequently, "each element must be supported in the same way as any other matter on which the

plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

At the motion to dismiss stage, this court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Further, "we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at 561 (alteration in original) (quoting *National Wildlife Fed'n*, 497 U.S. at 889). Therefore, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

In their brief, Plaintiffs argue that although Defendants did not file a motion to dismiss prior to appeal, this court should apply a motion to dismiss standard in determining whether they have standing to challenge the 1996 inventory because "when standing to sue is raised this early in the litigation, such

as in the context of a preliminary injunction, the [motion to dismiss standard] applies."[14]  Defendants, however, suggest a more stringent standard should apply in cases such as this, when a plaintiff is the beneficiary of a preliminary injunction.  *Cf. Church v. City of Huntsville*, 30 F.3d 1332, 1336 & 1336 n.1 (11th Cir. 1994) (applying motion to dismiss standard to determine standing on appeal from a preliminary injunction because defendants did not challenge standing before the district court, but "leav[ing] for another day a determination of the degree of evidence necessary to support standing at the preliminary injunction stage when the plaintiff is on notice that standing is contested").

We need not decide whether a heightened standard is generally appropriate to establish standing at the preliminary injunction stage, however, because we conclude that even under the more lenient motion to dismiss standard, Plaintiffs have not met their burden of demonstrating standing to challenge the 1996 inventory.  We accordingly evaluate Plaintiffs' alleged injuries through the lens of the more lenient motion to dismiss standard.

1.    **Acting in Contravention of the Law**

In their Complaint, Plaintiffs generally assert they have been injured because Defendants are acting without authority and otherwise in contravention of

---

[14]Plaintiffs cite no authority for this statement.

established procedures.[15]  On appeal, Plaintiffs appear to abandon these arguments altogether in the standing context[16] and for good reason:  the mere allegation that Defendants are acting without authority or in violation of the law is insufficient to establish standing.

The Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with [the] law is not sufficient, standing alone, to confer jurisdiction on a federal court."  *Allen*, 468 U.S. at 754 (holding plaintiffs lacked constitutional standing to challenge government action that allegedly violated the law); *cf. Diamond*, 476 U.S. at 62 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.").  To prevail on the merits, Plaintiffs must prove that Defendants have acted in contravention of the law.  To reach the merits, however, Plaintiffs must first identify a concrete injury flowing from Defendants' allegedly unlawful actions.  *See Valley Forge*, 454 U.S. at 485 ("Although respondents claim that the Constitution has been violated, they claim nothing else.  They fail

---

[15]In particular, Plaintiffs claim they are injured because (1) Defendants lack authority to include state trust lands in the 1996 inventory; (2) Defendants have improperly singled out the State of Utah for "unique and special study"; (3) Defendants lack authority to conduct the 1996 inventory; and (4) Defendants arbitrarily changed their interpretation of FLPMA and the WIH.

[16]In arguing they are likely to prevail on the merits, which is a requirement for obtaining a preliminary injunction, Plaintiffs do maintain their contention that Defendants lack authority to conduct the 1996 inventory and to include state trust lands in the inventory.

to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III ....”). We therefore consider Plaintiffs' additional claims of injury to determine whether Plaintiffs have shown a concrete injury flowing from Defendants' allegedly unlawful conduct.[17]

_____

[17]On appeal, Defendants primarily rely on FLPMA § 201 as providing the necessary authority to conduct the 1996 inventory, but also assert they have authority under FLPMA § 603. Just prior to this litigation, however, Defendants explicitly rejected § 603 as providing the necessary authority to conduct the inventory. *See, e.g.*, Letter from Bruce Babbitt, Secretary of the Interior, to James V. Hansen, Chairman, Subcommittee on National Parks, Forests, and Public Lands 2 (July 24, 1996) (“I also agree with you that FLPMA's section 603 no longer provides authority to inventory BLM land in Utah for wilderness values.”); BLM, U.S. Dep't of the Interior, *Utah Wilderness Review Procedures* (1996) [hereinafter 1996 Procedures] (stating “wilderness review mandate” of § 603 “has been completed” and identifying, inter alia, § 201 as authority for conducting the 1996 inventory). Similarly, in other wilderness inventory contexts, such as inventories of newly acquired public lands, BLM has consistently relied on FLPMA §§ 201 and 202, not § 603, as providing the necessary authority to conduct the inventories. *See, e.g.*, *Wilderness Society*, 119 I.B.L.A. 168, 170-72 (1991) (noting “second inventory” of lands previously inventoried under § 603 and inventory of adjacent newly acquired parcels was completed under § 201, not § 603); Amendment of Notice of Intent, 56 Fed. Reg. 40,341 (1991) (announcing intent to prepare land use plan and to inventory newly acquired public lands for wilderness values, and citing § 202 as authority).

In proceedings before the district court, Defendants relied solely on § 201 as providing authority to conduct the inventory. In their Memorandum in Opposition to Motion for a Temporary Restraining Order and Preliminary Injunction, Defendants noted that “[w]hile letters from the Secretary and the State Director have cited various provisions of FLPMA for the authority to undertake the re-inventory, section 201(a) provides the authority necessary.” During the hearing on Plaintiffs' motion for a preliminary injunction, the district court

## 2. Denial of Public Participation

Plaintiffs also claim they are injured by Defendants' refusal to allow public participation in the inventory process, in violation of FLPMA § 201.[18]

___

questioned Defendants' authority to conduct the inventory. After the hearing, Defendants requested leave to submit supplemental memoranda on the Secretary's authority under § 201 to conduct the inventory. In their letter accompanying the request, Defendants stated that "[t]he Secretary of Interior has authority under FLPMA independent of § 603 to consider lands for wilderness review." The district court did not respond to Defendants' request.

The 1996 inventory focuses on specific lands previously inventoried under § 603 and is limited to determining whether these lands are roadless and possess wilderness characteristics. *See* 1996 Procedures*, supra.* The inventory will not address the suitability of the lands for management as wilderness. *See id.* In determining whether public lands are suitable for designation as wilderness, BLM considers "all values, resources, and uses of the lands," not just whether the lands are roadless and possess wilderness characteristics. *See, e.g.*, WIH, *supra*, at 3. Section 603 envisions a much more comprehensive process (including interim wilderness management of WSAs, suitability analysis, and wilderness recommendations to the President and Congress) than that implemented by the 1996 inventory.

We agree with Plaintiffs that the Secretary's express rejection of § 603 in actions prior to this appeal renders Defendants' reliance on § 603 before this court questionable. In addition, Defendants' sole reliance on § 201 before the district court suggests that § 603 was merely an afterthought on appeal. We therefore reject Defendants' claim that they were conducting the inventory under the authority of § 603 and analyze the remainder of Plaintiffs' alleged injuries as though Defendants were proceeding under § 201. *Cf. Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575, 1577 (10th Cir. 1994) (discussing whether agency action was "arbitrary and capricious" and rejecting "[a]fter-the-fact rationalization by counsel in briefs or argument").

[18]Plaintiffs proceeded before the district court on alternative theories. They first alleged that Defendants lacked statutory authority to conduct the 1996 inventory. As noted in the preceding section, Plaintiffs have appropriately abandoned the contention that they are automatically entitled to standing merely because they allege Defendants are without authority to conduct the inventory. In the alternative, Plaintiffs alleged *inter alia* that even if the inventory was proper

Defendants counter that § 201 does not require public participation in the inventory itself.[19]  Further, Defendants argue that any injury suffered by Plaintiffs from the denial of such participation is conjectural and hypothetical since it is not yet known how Defendants will utilize the report based on the inventory and, moreover, whether Plaintiffs will even disagree with the results of the inventory.

We first look to the relevant provisions of FLPMA to determine whether Plaintiffs have a right to participate in the inventory process.[20]  If we conclude

under FLPMA § 201, the public had a right under FLPMA to participate in the inventory.  This alternative argument assumes that Defendants have authority under § 201 to conduct the inventory.  For purposes of analyzing Plaintiffs' alleged injuries, we also assume, though we do not decide, that Defendants do have authority under § 201 to conduct the 1996 inventory.

[19]We note that BLM representatives attended several meetings with various state and local officials concerning the 1996 inventory and, although it did not solicit information, BLM did "welcome any information" pertinent to the inventory.  Letter from G. William Lamb, State Director, BLM, to Mark O. Walsh, Utah Association of Counties 2 (Sept. 18, 1996).

[20]Whether FLPMA grants public participation rights to Plaintiffs in the inventory process is a legal question.  This court need not accept Plaintiffs' allegation that they are entitled to public participation. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994) (noting that in determining standing, court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions"); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) (noting that in determining standing, court does not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations"); *cf. Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (noting that when reviewing dismissal for lack of subject matter jurisdiction, plaintiff "may not rest merely on 'unsupported conclusions or interpretations of law'" (quoting *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993)).
We recognize that in cases when the standing inquiry overlaps with the

that Plaintiffs do not have such a right, then Plaintiffs' claimed injury based on

the denial of this right is without merit and they consequently lack standing to

challenge the 1996 inventory on these grounds. *See Claybrook v. Slater*, 111 F.3d

904, 907 (D.C. Cir. 1997) ("[I]f the plaintiff's claim has no foundation in law, he

has no legally protected interest and thus no standing to sue."); *Arjay Assocs., Inc.

v. Bush*, 891 F.2d 894, 898 (Fed. Cir. 1989) ("We hold that appellants lack

standing because the injury they assert is to a nonexistent right ...."). If, however,

we conclude that FLPMA does provide for public participation during the

inventory process, we must then decide whether denial of this right constitutes an

---

merits of the plaintiff's claim, courts have been inconsistent in their willingness
to resolve legal questions in determining standing. *See Taylor v. FDIC*, No. 96-
5267, 1997 WL 791655, at *11 (D.C. Cir. Dec. 23, 1997) (discussing differing
treatment). In this case, however, we conclude it is appropriate to resolve the
legal question of whether FLPMA provides for public participation to the extent
necessary to determine whether Plaintiffs have suffered an injury-in-fact for
standing purposes. *Cf. id.* at *10-*11 (disposing of reinstatement claim on
standing grounds after rejecting plaintiffs' assertion that voluntary departure
constituted a constructive discharge); *Claybrook v. Slater*, 111 F.3d 904, 906-09
(D.C. Cir. 1997) (holding plaintiff lacked standing after concluding the statute
upon which plaintiff relied in bringing her claim did not impose legal duty
plaintiff claimed it did); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 898 (Fed. Cir.
1989) (holding plaintiffs lacked standing because "the injury they assert is to a
nonexistent right to continued importation of a Congressionally excluded
product"); *see also Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221,
1226 (D.C. Cir. 1993) ("Appellants ... overlook the character of the questions
before the district court when an agency action is challenged. The entire case on
review is a question of law, and only a question of law. And because a court can
fully resolve any purely legal question on a motion to dismiss, there is no inherent
barrier to reaching the merits at the 12(b)(6) stage.").

injury for standing purposes and, further, whether the denial of public participation at this point constitutes a final agency action ripe for review.

As authority to conduct the 1996 inventory, Defendants rely on FLPMA § 201, which provides:

> The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.
> ... [T]he Secretary shall ... provide State and local governments with data from the inventory for the purpose of planning and regulating the uses of non-Federal lands in proximity of such public lands.

43 U.S.C. § 1711. The district court concluded that even assuming Defendants have authority under § 201 to conduct the inventory, "it appears to be contrary to law that such an effort can be made without public involvement."

To determine whether FLPMA requires public participation during the inventory process, we look first to the language of the relevant statutory provisions. *See Russello v. United States*, 464 U.S. 16, 20 (1983). "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Id.* (internal quotations omitted).

FLPMA § 201 is entitled "Continuing inventory and identification of public lands; preparation and maintenance." 43 U.S.C. § 1711. Section 201 is the first section in a subchapter entitled "Land Use Planning and Land Acquisition and Disposition." FLPMA § 202, entitled "Land use plans," sets forth the process for the development, maintenance, and revision of land use plans by the Secretary. *Id.* § 1712. Section 202 is replete with requirements for public participation.[21]

---

[21]The relevant public participation provisions of FLPMA § 202 are as follows:

> **(a) Development, maintenance, and revision by Secretary**—The Secretary shall, with public involvement ... develop, maintain, and, when appropriate, revise land use plans ....
>
> ....
>
> **(c) Criteria for development and revision**—In the development and revision of land use plans, the Secretary shall--
>
> ....
>
> (9) ... coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs ... of the States and local governments within which the lands are located .... In implementing this directive, the Secretary ... shall provide for meaningful public involvement of State and local government officials ... in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands....
>
> ....
>
> **(f) Procedures applicable to formulation of plans and programs for public land management**—The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

Unlike § 202, however, § 201 on its face contains no such requirement. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Brown v. Gardner*, 513 U.S. 115, 120 (1994) (quoting *Russello*, 464 U.S. at 23); *cf. United States v. Granderson*, 511 U.S. 39, 63 (1994) (Kennedy, J., concurring in the judgment) ("The presumption [that Congress acts intentionally and purposely in the disparate inclusion or exclusion] loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment.").

Plaintiffs argue § 201 must be read in conjunction with § 202 and that public participation must therefore be provided throughout the land use planning process, which they assert includes the inventory. Although § 201 and § 202 are certainly related in that the provisions of both sections are utilized in the overall land use planning process, the sections have different purposes and different requirements. Section 201 provides for a continuing inventory and identification of the public lands, whereas § 202 addresses the development, maintenance, and revision of land use plans. The public participation requirements of § 202 apply

43 U.S.C. § 1712(a), (c)(9), (f). The regulations to FLPMA § 202 set forth specific requirements for public participation during the preparation, amendment, and revision of land use plans. *See, e.g.*, 43 C.F.R. §§ 1610.2, 1610.4.

only when the Secretary is making decisions regarding land use plans, i.e., when the Secretary is making decisions directly affecting the actual management of the public lands. Section 202's requirements do not apply when the Secretary is merely conducting an inventory of public lands under the authority of § 201, an inventory which, according to the plain language of § 201, shall not affect the management or use of the public lands.[22] We have found nothing to suggest that any time the Secretary conducts an inventory under § 201, he necessarily engages in land use planning under § 202. The plain language of § 201 belies this suggestion: the Secretary is legislatively directed by § 201 to maintain "on a continuing basis" an inventory of the public lands, which must be "kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." 43 U.S.C. § 1711(a).

---

[22]Defendants have not argued on appeal nor did they argue before the district court that they were conducting the 1996 inventory under the authority of FLPMA § 202. We note, however, that various documents in the record contain oblique references by Defendants to § 202 in the context of their authority to conduct the inventory. Nevertheless, Defendants have never asserted that they are currently amending the land use plan for the lands included in the inventory. Defendants have acknowledged that amending the land use plan for these lands is a "possible next step[]," but have noted this is only one possibility. Letter from Bruce Babbitt, Secretary of the Interior, to James V. Hansen, Chairman, Subcommittee on National Parks, Forests, and Public Lands 2-3 (July 24, 1996). Another possibility stated by Defendants is that they may formulate, through a legislative NEPA process, new wilderness recommendations to Congress. *See id.* Defendants have consistently acknowledged that if they do in fact amend the land use plan in the future, they will be required to comply with the public participation requirements of § 202.

Though Plaintiffs urge otherwise, the 1996 inventory cannot be characterized as a "land use plan," "land use program," "land use regulation," or "land use decision," requiring public participation under § 202. For example, the regulations under § 202 describe a "land use plan" as a written document which addresses eight factors[23] and which is "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. §§ 1601.0-5(k), 1601.0-2. Section 201, on the other hand, explicitly provides that "[t]he preparation and maintenance of [an] inventory ... shall not, of itself, change or prevent change of the management or use of public lands." 43 U.S.C. § 1711(a). This express limitation on the consequences of conducting an inventory supports Defendants' contention that neither the inventory nor the report based on the inventory make any decisions concerning the management or use of the public lands.

Defendants have consistently maintained that once the Secretary reviews the report based on the 1996 inventory, the Secretary will make the report public and determine what further action, if any, will be taken. Defendants have further

---

[23]These eight factors are: (1) land areas for specific use, designation, or transfer; (2) allowable resource uses; (3) resource condition goals and objectives; (4) program constraints; (5) need for more specific and detailed plans; (6) support action necessary to achieve goals; (7) general implementation sequences of planned actions; and (8) intervals and standards for monitoring and evaluating the plan. *See* 43 C.F.R. § 1601.0-5(k).

acknowledged that if they later decide to consider amending the land use plan to manage lands included in the inventory as WSAs, they will be required to comply with NEPA and FLPMA § 202, thereby affording Plaintiffs full public participation rights.[24]  If Defendants amend the plan without allowing Plaintiffs to participate in the process, Plaintiffs may bring a claim to set aside the amendment.  *See National Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1529-31, 1533 (10th Cir. 1993) (setting aside land use plan amendment because BLM failed to give sufficient notice and comment).

If Defendants later decide to recommend wilderness legislation for the lands being inventoried, they will be required to comply with NEPA, which provides opportunities for public comment.  *See, e.g.*, NEPA § 102, 42 U.S.C. § 4332; 40 C.F.R. §§ 1506.6, 1506.8.  If Defendants fail to comply with NEPA, Plaintiffs may bring suit at the appropriate time.  *See Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996) (holding plaintiffs had standing to challenge Forest Service decision which was allegedly made without complying with NEPA); *Trustees for Alaska v. Hodel*, 806 F.2d 1378 (9th Cir. 1986)

---

[24]Although FLPMA § 202 requires the Secretary to rely on the inventory of the public lands when revising a land use plan, the inventory is only one of nine factors the Secretary is directed to consider.  *See* 43 U.S.C. § 1712(c).  Further, nothing in the statute or the regulations indicates that Plaintiffs would be precluded from challenging the results of the inventory if those results are utilized in proposing a revision to a land use plan.

(enjoining government from submitting report to Congress because government failed to comply with public participation requirements of NEPA). Further, if, as Plaintiffs fear, a report based on the inventory is given directly to Congress, bypassing any public participation at the local level, Congress will certainly not be bound by the report, as it has complete discretion in designating public lands as wilderness.[25]

This court therefore concludes FLPMA § 201 does not require public participation during the inventory process. Plaintiffs' claim that they are injured by the denial of public participation with respect to the 1996 inventory is consequently without merit.[26] Plaintiffs therefore have no standing to challenge

---

[25]Any future injury Plaintiffs may suffer from the submission of the inventory report directly to Congress is speculative at best. As the district court itself recognized, "it is not presently known what the results of the reinventory will be or for that matter whether the Plaintiffs will disagree with those results." Given this uncertainty and the uncertainty of what Congress might do, if anything, with the report, we are left with "a conjecture based on speculation that is bottomed on surmise." *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992) (holding Wyoming lacked standing to challenge Secretary's exchange of federally owned coal for easement).

[26]Plaintiffs also apparently argue they have been injured because they were not allowed to comment on the adoption of the 1996 Procedures, in violation of FLPMA and the APA. It is unclear upon which provision of FLPMA Plaintiffs base their claim. In their Complaint, Plaintiffs reference both FLPMA § 309 and FLPMA § 310. Neither of these provisions provide a basis for their claim.
Section 309 provides that
the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to

the inventory based on this alleged injury. *See Claybrook*, 111 F.3d at 907; *Arjay*, 891 F.2d at 898.

### 3. Imposition of a Wilderness Management Standard

Plaintiffs further allege that Defendants have been unlawfully imposing a de facto wilderness management standard on non-WSA public lands included in the H.R. 1500 and H.R. 1745 wilderness bills[27] as a result of a November 1993

> participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

43 U.S.C. § 1739(e). As previously discussed, the 1996 inventory is not a land use "plan" or "program" and does not affect the management of the public lands. Therefore, Plaintiffs' claim that they were denied an opportunity to comment on the 1996 Procedures under § 309 is without merit.

Section 310 provides the Secretary with general rule-making authority to carry out the purposes of FLPMA and requires the Secretary to promulgate rules and regulations in accordance with the rule-making provisions of the APA. *See* 43 U.S.C. § 1740. To the extent Plaintiffs generally allege they were injured because they were denied an opportunity to comment on the 1996 Procedures under the APA, their argument is unpersuasive. Plaintiffs have not identified a concrete injury resulting from the alleged procedural violation, but have merely asserted their "interests in ensuring that Defendants employ public procedures and standards are injured by Defendants' recent failure to do so." "This abstract, generalized 'injury' is not sufficient to afford standing." *Animal Legal Defense Fund, Inc. v. Glickman,* 130 F.3d 464, 471 (D.C. Cir. 1997) (holding allegation that Secretary failed to comply with notice and comment provisions of APA was insufficient to afford standing because plaintiff "failed to make the case that it has suffered a concrete injury as distinguished from the abstract procedural right to submit comments").

Moreover, it is difficult to understand how Plaintiffs could be injured from the allegedly improper promulgation of the procedures used to conduct the inventory when they cannot identify a concrete injury from the inventory itself.

[27]H.R. 1500 and H.R. 1745 were introduced before the 104th Congress in 1995. H.R. 1500 would have designated approximately 5.7 million acres of federal lands in Utah as wilderness, whereas H.R. 1745 would have designated

letter from the Secretary to the BLM Utah State Director.[28]  In claiming that

Defendants are imposing a "de facto wilderness management standard," Plaintiffs

argue that Defendants are essentially imposing an IMP standard, which is used to

ensure the continuing suitability of public lands for designation as wilderness.

Plaintiffs assert that only those lands designated as WSAs pursuant to FLPMA

§ 603 or FLPMA § 202 may be managed under an IMP standard.[29]  According to

Plaintiffs, application of the IMP standard precludes many uses on federal lands,

which in turn limits access to and uses of state trust lands surrounded by the

particular federal lands ("inheld" state trust lands).

Plaintiffs assert that Defendants' imposition of a wilderness management

standard on non-WSA public lands violates FLPMA.  Plaintiffs argue that to

lawfully impose such a standard, the lands must be formally designated as WSAs

and the relevant land use plan must be amended.  Further, in amending the land

---

approximately 2.1 million acres as wilderness.  Neither bill passed.  *See supra* note 4 (discussing wilderness bills).  The 1996 inventory includes all public lands identified in the H.R. 1500 and H.R. 1745 wilderness bills.  *See* 1996 Procedures, *supra*.

[28]Plaintiffs quote the following language from the Secretary's letter:  "I want you to make sure that any BLM management decisions affecting potential wilderness on BLM lands in Utah, whether within formally designated WSA's or not, are given your careful attention."

[29]The IMP was initially adopted to guide the management of the public lands subject to the FLPMA § 603 process.  *See supra* Part I.A.  According to Plaintiffs, the IMP has been extended by policy to lands designated as WSAs pursuant to FLPMA § 202.

use plan, Defendants must comply with the public participation requirements of FLPMA § 202. Plaintiffs allege they have been injured by the imposition of the wilderness management standard because it impairs their ability to lease inheld state trust lands for grazing and mineral development.

To satisfy the traceability requirement of constitutional standing, Plaintiffs must show there is a "causal connection between the injury and the conduct complained of--the injury has to be 'fairly ... trace[able] to the challenged action of the defendant.'" *Defenders of Wildlife*, 504 U.S. at 560 (alteration and ellipses in original) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Even if Plaintiffs do show an injury-in-fact with a causal nexus to the 1996 inventory, this alone is insufficient to establish Article III standing. Plaintiffs must also show "there is at least a 'substantial likelihood that the relief requested will redress the injury claimed.'" *Baca v. King*, 92 F.3d 1031, 1036 (10th Cir. 1996) (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n.20 (1978) (internal quotations omitted)).

Significantly, Plaintiffs do not allege that Defendants' initial imposition of the de facto wilderness management standard was in any way related to Defendants' decision to conduct the inventory. Rather, Plaintiffs allege the standard was imposed in response to a letter written by the Secretary in 1993, three years before the Secretary undertook the inventory. Therefore, Plaintiffs'

alleged injury is not fairly traceable to the 1996 inventory nor is it likely to be redressed by enjoining the inventory. Accordingly, Plaintiffs have no standing to challenge the inventory based on the alleged imposition of a de facto wilderness management standard.[30]

While not premising their challenge to the 1996 inventory on the initial imposition of a de facto wilderness management standard, Plaintiffs do make a failed attempt to link the two prospectively. Specifically, Plaintiffs allege that Defendants will formalize the wilderness management standard as a result of the inventory.[31] Plaintiffs also allege that, "[i]n light of Defendants' past actions,"

---

[30]Whether Plaintiffs have standing to directly challenge Defendants' alleged imposition of a de facto wilderness management standard is discussed in *infra* Part II.C. At this juncture, we merely conclude that Plaintiffs do not have standing to challenge the 1996 inventory based on their alleged injury from imposition of the standard.

[31]As the basis for this conclusion, Plaintiffs first assert that under the 1996 Procedures, the public lands included in the inventory "will be considered extensions of existing WSAs." Plaintiffs then assert that because WSAs are managed under the IMP, "[i]t follows that Defendants will manage these units under the IMP standards."

To support their assertion that the public lands included in the 1996 inventory "will be considered extensions of existing WSAs," Plaintiffs apparently rely on the following statement in the 1996 Procedures: "When review units are contiguous to WSAs, they should be considered an extension of the WSA so that no additional evaluation of outstanding opportunities is required." 1996 Procedures, *supra*. Read in context, this statement provides that review units contiguous to existing WSAs are to be considered extensions of those WSAs in determining whether the units possess "outstanding opportunities for solitude or a primitive and unconfined type of recreation," which is one of several factors for determining whether public lands have wilderness characteristics. *See id.* Contrary to Plaintiffs' suggestion, the Procedures do not provide that these review

Defendants will fail to provide for notice and comment when they formally adopt the management standard.

To satisfy the injury-in-fact requirement of constitutional standing, the burden is on Plaintiffs to show they are "immediately in danger of sustaining some direct injury" as a result of the 1996 inventory and that the threat of injury is "real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). Plaintiffs' bald allegation that Defendants will at some time formally manage the lands included in the inventory under the IMP, and that they will do so without public involvement in violation of FLPMA, is not sufficient to satisfy this burden. Their claimed injury is purely speculative, in that it is based solely on their assertion that Defendants will violate the law at some undetermined time in the future. Consequently, their claim does not satisfy the case or controversy requirements of Article III. *See Defenders of Wildlife*, 504 U.S. at 564 n.2 (discussing "imminency" requirement of constitutional standing and stating that purpose "is to ensure that the alleged injury is not too speculative for Article III purposes-- that the injury is '*certainly* impending'" (internal quotation marks omitted)).

---

units will automatically be managed under the IMP simply because they are considered extensions of existing WSAs for this one specific evaluation purpose.

If Defendants do in fact amend the land use plan to manage the lands included in the inventory as WSAs under the IMP, and do so without the public participation required by FLPMA § 202, Plaintiffs may challenge the plan amendment at that time. *See supra* Part II.B.2. If Plaintiffs are then entitled to relief, the appropriate remedy would be to enjoin the misuse of the inventory, not its preparation. At this point, however, Plaintiffs have not suffered a concrete, actual or imminent injury and thus have no standing to challenge the 1996 inventory on these grounds.

**4.    Roads**

In their Complaint, Plaintiffs assert that the 1996 Procedures adopted for the 1996 inventory contain a different definition of "roadlessness" than the WIH, which was adopted for the original FLPMA § 603 wilderness review process. A determination of "roadlessness" is a prerequisite to a finding of wilderness. *See* FLPMA § 603, 43 U.S.C. § 1782(a). Plaintiffs specifically claim the 1996 Procedures exclude from consideration the following, all of which were considered under the WIH: "(a) roads that are regularly and continuously used, even if there is no regular mechanical maintenance; (b) roads maintained by tools but not by mechanical means; and (c) whether there is public support for the use of the road." As a result of the new definition of "roadlessness" utilized by the 1996 Procedures, Plaintiffs assert that more public lands reviewed in the 1996

inventory will be considered "roadless" than under the WIH and, consequently, more lands will be considered suitable for wilderness designation.

In their Complaint, Plaintiffs allege the change in definition of "roadlessness" violates the APA because it is an arbitrary change in interpretation of the WIH and FLPMA. Plaintiffs claim their "interests are injured by Defendants' failure to explain the significant changes in ... interpretation." As we have already discussed, a generalized grievance that Defendants are acting in violation of the law is not sufficient to afford standing. *See supra* Part II.B.1. To establish standing, Plaintiffs must identify a concrete injury flowing from Defendants' allegedly unlawful change in interpretation.

While far from clear, Plaintiffs apparently allege they are injured as a result of their inability to comment on whether the particular lands included in the 1996 inventory are roadless. Plaintiffs argue that if the 1996 Procedures had used the same definition of "roadlessness" as the WIH, the requirement to consider public support for the use of a road would have allowed them to comment. The WIH is not controlling, however, as it was adopted for purposes of the FLPMA § 603 wilderness designation process, not for the purpose of conducting inventories under the authority of FLPMA § 201. Therefore, the WIH does not provide Plaintiffs with a right to comment in this instance. As previously discussed, Plaintiffs also have no right under § 201 to participate in the inventory process.

*See supra* Part II.B.2. Again, if Defendants later rely on the results of the inventory in amending the land use plan for the lands included in the inventory, Defendants will be required under FLPMA § 202 to provide the public with an opportunity to comment.

Plaintiffs also claim that Defendants changed their road maintenance policies as a result of their decision to conduct the 1996 inventory. In support of their motion to preliminarily enjoin Defendants from completing the inventory, Plaintiffs submitted several affidavits from various county officials discussing changes to Defendants' road maintenance policies since the inventory was commenced. Specifically, the affiants testified that Defendants revoked a cooperative road agreement, required counties to seek permission to maintain their own roads, and initiated trespass actions against certain counties for routine road maintenance activities. To link the alleged change in road maintenance policies to Defendants' decision to conduct the inventory, Plaintiffs primarily rely on the temporal proximity of Defendants' actions to the inventory. Plaintiffs also rely on what they term "admissions" by BLM officials concerning the relationship between the alleged change in policy and Defendants' decision to undertake the inventory.

In response, Defendants argue that neither their decision to conduct the inventory nor the 1996 Procedures "establish, change, or even address, any

policies regarding road maintenance in Utah." Defendants particularly note the trespass actions against the counties have not been limited to just those lands included in the inventory: counties have also been sued for unauthorized "destructive activities" on WSAs and National Park Service lands.

We first note it is questionable whether the alleged changes to road maintenance policies can be traced to Defendants' decision to conduct the inventory. Regardless, enjoining the inventory is not substantially likely to redress Plaintiffs' injuries. Assuming that Defendants have changed their road maintenance policies as a result of their decision to conduct the inventory, enjoining Defendants from completing the inventory would not require them to reinstate their previous road maintenance policies. To redress their injuries, Plaintiffs would need specific relief addressing the alleged changes in road policies, such as a judgment requiring Defendants to adhere to a specific agreement, a declaration that Defendants improperly required county officials to seek permission to maintain a particular road, or an injunction against a specific trespass action. *Cf. Humboldt County v. United States*, 684 F.2d 1276, 1278 (9th Cir. 1982) (considering county's argument that BLM's closure of two roads was improper because county held right-of-way in the roads and because BLM failed to comply with applicable law in closing the roads). Plaintiffs have sought no such relief in this case. Thus, because enjoining the inventory would not remedy

-44-

Plaintiffs' claimed injuries resulting from the alleged changes to road maintenance policies, Plaintiffs have not satisfied the redressability requirement of constitutional standing.[32]  *Cf. Baca*, 92 F.3d at 1037 (holding lessee of federal land lacked standing to challenge exchange of federal land for private land because voiding the exchange was not likely to result in BLM renewing the grazing lease, thereby redressing lessee's injury); *Wyoming ex rel. Sullivan*, 969 F.2d at 881-82 (holding State lacked standing to challenge exchange of federally owned coal for conservation easement because voiding the exchange would not necessarily result in BLM offering the coal for competitive leasing, thereby redressing State's injury).

### 5.  NEPA Violation

Finally, Plaintiffs assert they are injured by Defendants' failure to prepare an EIS in violation of NEPA.  NEPA requires all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" addressing certain environmental considerations.  NEPA § 102, 42 U.S.C. § 4332(2)(C).  The term "major federal

---

[32]To the extent Plaintiffs claim the alleged changes to road maintenance policies are attributable to Defendants' imposition of a de facto wilderness management standard, their claim is encompassed in the cause of action directly challenging imposition of the standard.  *See infra* Part II.C.

action" "includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. The regulations to FLPMA § 202 provide that "[a]pproval of a [land use] plan is considered a major Federal action." 43 C.F.R. § 1601.0-6. If a federal agency is required to prepare an EIS and fails to do so, an action may be brought to compel compliance with NEPA. *See Committee to Save the Rio Hondo*, 102 F.3d at 452 (holding environmental organization had standing to challenge Forest Service decision which was allegedly made without complying with NEPA).

Plaintiffs assert the 1996 inventory constitutes a "major federal action," thereby requiring compliance with NEPA.[33] We fail to see, however, how an inventory of public lands constitutes a "major federal action significantly affecting the quality of the human environment." NEPA § 102, 42 U.S.C. § 4332(2)(C). FLPMA § 201 expressly provides that an inventory "shall not, of itself, change or prevent change of the management or use of public lands." 43

---

[33]This court need not accept Plaintiffs' allegation that the 1996 inventory constitutes a "major federal action," necessitating preparation of an EIS. Although this issue is intertwined with the merits of Plaintiffs' claim, we conclude it is appropriate to resolve the issue to the extent necessary to determine whether Plaintiffs have suffered an injury-in-fact for standing purposes. *See supra* note 20 (discussing appropriateness of resolving legal questions to determine standing).

To the extent Plaintiffs allege that imposition of a de facto wilderness management standard constitutes a "major federal action" requiring preparation of an EIS, their claim is encompassed in the cause of action directly challenging imposition of the standard. *See infra* Part II.C.

U.S.C. § 1711(a). Further, as we have already discussed, the 1996 inventory does not constitute an amendment to or revision of a land use plan. *See supra* Part II.B.2. The inventory also cannot be characterized as a "proposal for legislation." As previously stated, if Defendants later utilize the report based on the inventory in recommending wilderness legislation or if they decide to amend the land use plan, they will be required to comply with NEPA at that time. At this stage, however, NEPA does not require preparation of an EIS. *See Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997) (holding national policy which "maintained the substantive *status quo*" could not be characterized as a "major federal action"); *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) (holding federal government's "acquisition of negative easement which by its terms prohibits any change in the status quo does not amount to [a] 'major Federal action[]'" (second alteration in original)). Therefore, Plaintiffs' claim that they are injured by Defendants' failure to prepare an EIS for the 1996 inventory is without merit and does not constitute a foundation upon which to premise standing. *Cf. Claybrook*, 111 F.3d at 907 ("[I]f the plaintiffs' claim has no foundation in law, he has no legally protected interest and thus no standing to sue."); *Arjay*, 891 F.2d at 898 ("We hold that appellants lack standing because the injury they assert is to a nonexistent right ....").

### 6. Summary

Plaintiffs have failed to identify a concrete, actual or imminent injury-in-fact which is fairly traceable to the 1996 inventory and likely to be redressed by a favorable decision. As a consequence, the power of judicial review does not now extend to the 1996 inventory conducted by the executive branch. In light of our conclusion that Plaintiffs lack constitutional standing, we need not address whether prudential limitations or the statutory requirements for judicial review under the APA would also preclude review of Plaintiffs' claims. *See Baca*, 92 F.3d at 1037. The district court's order enjoining Defendants from completing the inventory is therefore vacated. We remand to the district court to dismiss those causes of action related directly to the inventory, i.e., Plaintiffs' first, second, third, fourth, fifth, seventh, and eighth causes of action.

## C. Standing to Challenge De Facto Wilderness Management

We next consider whether Plaintiffs have standing to directly challenge Defendants' alleged imposition of a de facto wilderness management standard on non-WSA federal lands, in violation of FLPMA. In determining whether Plaintiffs have standing to bring this claim, their sixth cause of action, we apply the motion to dismiss standard.[34]

---

[34]Plaintiffs moved for a preliminary injunction only with respect to the 1996 inventory. Plaintiffs did not move for a preliminary injunction to enjoin Defendants from imposing the de facto management standard. In arguing against Plaintiffs' motion to enjoin the inventory, Defendants did not directly challenge Plaintiffs' standing to bring their de facto management claim. Further, in their

As previously discussed, Plaintiffs allege that Defendants began imposing the de facto management standard in response to a letter written by the Secretary in 1993, three years before the Secretary announced his decision to conduct the 1996 inventory. *See supra* Part II.B.3. Plaintiffs' claim that Defendants are currently imposing such a standard is therefore not directly related to Defendants' decision to conduct the 1996 inventory. Accordingly, Plaintiffs' de facto management cause of action is not foreclosed by our decision that Plaintiffs lack standing to challenge the inventory. To the extent Plaintiffs base their standing to challenge the 1996 inventory on this cause of action, however, we have considered and rejected their argument.

Plaintiffs essentially argue that imposition of the de facto wilderness management standard amounts to an "informal" amendment to the land use plan. As previously discussed, FLPMA § 202, which governs land use plans, provides for public participation throughout the land use planning process, including amendments to land use plans. *See supra* Part II.B.2. Plaintiffs assert they were denied an opportunity to comment on the amendment and allege they have been

briefs on appeal, both parties focused on the inventory and did not specifically address whether imposition of a de facto management standard could be brought as an independent cause of action. In light of these facts, we apply the more lenient motion to dismiss standard in determining whether Plaintiffs have standing to bring their de facto management claim.

injured because imposition of the standard impairs their ability to lease their state trust lands.

In support of their claim that Defendants are currently imposing a de facto wilderness management standard, Plaintiffs reference only a nebulous statement made by the Secretary in 1993.[35]  Importantly, Plaintiffs allege no specific interferences with their state trust lands resulting from such management.  Before the district court, Plaintiffs submitted an affidavit from the Director of the State Trust Lands Administration to support their motion for a preliminary injunction to enjoin the inventory.  This affidavit, however, does not support Plaintiffs' allegation that Defendants are currently imposing a de facto wilderness management standard, but rather discusses generally the effects on inheld state trust lands when surrounding federal lands are managed as WSAs under the IMP or are designated as wilderness.

Nevertheless, because general allegations of injury based on a legally cognizable right suffice at this stage, and because we must accept as true Plaintiffs' factual allegations, we conclude that Plaintiffs do have standing to bring their de facto management claim.[36]  Courts have recognized that an

_____

[35]*See supra* note 28 (quoting statement from Secretary).

[36]There are three separately named Plaintiffs in this suit:  the State of Utah, the Utah School and Institutional Trust Lands Administration, and the Utah Association of Counties.  This court concludes the Trust Lands Administration, which is most directly injured by imposition of a de facto wilderness management

individual may enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Defenders of Wildlife*, 504 U.S. at 573 n.8. Plaintiffs have alleged a violation of their procedural rights under FLPMA and have alleged they are harmed by Defendants' imposition of the de facto wilderness management standard. Plaintiffs have requested that Defendants be enjoined from imposing the de facto standard at least until they comply with FLPMA by formally amending the land use plan and providing for notice and comment. Thus, Plaintiffs' injuries are redressable by a favorable decision.[37]

Plaintiffs have also satisfied the standing requirements of the APA: Defendants' alleged imposition of the de facto wilderness management standard constitutes a final agency action, and Plaintiffs' claims fall within the zone of interests protected by FLPMA. *See Catron County*, 75 F.3d at 1434 (holding APA standing requirements satisfied where county alleged Secretary failed to

standard, has standing to pursue the de facto wilderness management cause of action. Because we have concluded that one of the Plaintiffs has standing to bring the claim, we need not consider whether the other two Plaintiffs would also have standing to bring the claim. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

[37]The redressability and immediacy requirements are relaxed somewhat for those persons seeking to enforce procedural rights. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). For example, the plaintiff need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision. *See id.*; *see also Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

comply with NEPA when designating critical habitat). We therefore conclude Plaintiffs have standing to pursue their de facto management cause of action. Their sole available remedy, as requested in their Complaint, is an injunction prohibiting the alleged imposition of the de facto wilderness management standard until and unless Defendants comply with FLPMA.

We emphasize, however, that our decision is limited to the threshold issue of whether Plaintiffs' claim can survive a motion to dismiss. This court expresses no view on whether Plaintiffs' claim could survive a motion for summary judgment or whether their claim should succeed on the merits. We also note that if Defendants move for a summary judgment, Plaintiffs "can no longer rest on such 'mere allegations' [of injury], but must 'set forth' by affidavit or other evidence 'specific facts'" in support of their claim. *Defenders of Wildlife*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

### III.  CONCLUSION

This court concludes Plaintiffs do not have standing to challenge the 1996 inventory. Due to our resolution of the standing issue, we need not address Defendants' ripeness argument nor need we address Defendants' argument that the district court abused its discretion in granting Plaintiffs' motion for a preliminary injunction.

Because Plaintiffs lack standing to challenge the 1996 inventory, we **VACATE** the preliminary injunction entered by the district court enjoining Defendants from further work on the inventory and **REMAND** to the district court with instructions to **DISMISS** the seven causes of action directly related to the inventory. Finally, we **REMAND** to the district court for further consideration the one cause of action not directly related to the inventory, Plaintiffs' sixth cause of action, claiming that Defendants are currently imposing a de facto wilderness management standard on non-WSA public lands, in violation of FLPMA.[38]

---

[38]Plaintiffs' unopposed motion to supplement the record on appeal is hereby granted.