WYOMING SAWMILLS, INCOR-
PORATED, A Wyoming Corporation, Plaintiff,

v.

UNITED STATES FOREST SERVICE; Daniel Glickman, Secretary of Agriculture; Michael P. Dombeck, Chief of the Forest Service; Lyly Laverty, Regional Forester for Region II; Abigail Kimbell, Forest Supervisor for the Big Horn National Forest; Defendants,

and

Medicine Wheel Coalition on Sacred Sites of North America, Defendant–Intervener.

No. 99–CV–0031–J.

United States District Court,
D. Wyoming.

Dec. 6, 2001.

William Perry Pendley, William D. Thode, Susan Amanda Koehler, Mountain States Legal Foundation, Denver, CO, for Plaintiff.

Nicholas Vassallo, Assistant U.S. Attorney, Department of Justice, Cheyenne, WY, Albert C. Lin, Department of Justice, Washington, DC, for Defendant.

Andrew W. Baldwin, Baldwin & Crocker, Lander, WY, Jack F. Trope, Albuquerque, NM, for Defendant–Intervener.

## ORDER GRANTING THE UNITED STATES FOREST SERVICE'S AND MEDICINE WHEEL COALITION'S MOTION TO DISMISS

ALAN B. JOHNSON, District Judge.

The United States Forest Service ("NFS") and Medicine Wheel Coalition move for this Court to dismiss Wyoming Sawmills' ("Sawmills") complaint for lack of standing or alternatively on the merits.[1]

---

1. This Court will treat NFS's and Medicine Wheel Coalition's motions as a single motion

The Court, having reviewed carefully the briefs of the parties, the applicable law, all matters of record, and being fully advised, PARTIALLY GRANTS the NFS's motion to dismiss for lack of standing and finds in favor of the NFS on the remaining claims.

## BACKGROUND

The Medicine Wheel National Historic Landmark, located within the Big Horn National Forest in north-central Wyoming, is a prehistoric feature consisting of a circular structure of rocks with a diameter of eighty feet, and a large cairn (or rock pile) in the center of the circle, and 28 "spokes" of rocks radiating from the center to the edge of the circle. *See* Administrative Record ("AR") at 3839. While no Native American Tribe claims to have built the Medicine Wheel or knows when it was constructed, archeological evidence indicates that people have been present in the area for at least 7,500 years, and in the vicinity of the Wheel are numerous tepee rings, trails, and other archeological features and artifacts. *See* AR at 3839, 3853. The deep traditional historical and cultural value of the Wheel and nearby Medicine Mountain to Native Americans has been documented in various studies, and the Wheel is considered a sacred site by numerous Native American Tribes. *See* AR at 3839, 3854.

In June 1957, approximately 200 acres in Big Horn National Forest was withdrawn "for the protection and preservation of the archaeological values of the Medicine Wheel and adjacent historic area" from virtually all forms of claims, including mining and mineral claims. *See* 22 C.F.R. § 4135 (1957); AR at 3853. The Medicine

Wheel was designated as a National Historic Landmark in April 1969, with 110 acres included in that designation. *See* AR at 3853.

In the late 1980s, an increase in the number of visitors to the Medicine Wheel gave rise to concerns about visitor safety, as well as concerns for protecting vegetation and prehistoric features and artifacts. *See* AR at 3839, 3842. The forest service responded by beginning a process (starting in 1988) to develop a management plan to better protect the Medicine Wheel. *See* AR at 3842. This process, which has been characterized as "lengthy and often contentious," led to the development in 1991 of a Draft Environmental Impact Statement ("DEIS") setting forth various proposed management alternatives.[2] AR at 1–114, 3842. The DEIS preferred alternative involved, *inter alia,* road construction and improvements to allow unrestricted vehicular access except during ceremonial uses, construction of an expanded parking lot immediately adjacent to Medicine Wheel to accommodate twenty cars and five larger vehicles, and construction of restrooms at the parking lot. *See* 6–9, 35. When the DEIS was released, the Forest Service received more than 300 comments from the public, many of which were critical of the proposed management and called for greater sensitivity to Native Americans or to recreational and commodity uses. *See* AR at 3842.

In light of such comments, and in response to the controversy, the Forest Service withdrew the proposal contained in the DEIS and instead began a consultation process with the Wyoming State Historic

---

because they are substantially similar. Therefore, this order will refer only to NFS's arguments.

**2.** An Environmental Impact Statement ("EIS") is a document prepared pursuant to

the National Environmental Policy Act ("NEPA") that describes the environmental impacts of a proposed major federal action significantly affecting the quality of the human environment. *See* 42 U.S.C. § 4332(C).

Preservation Officer and the federal Advisory Council on Historic Preservation ("Advisory Council").[3] *See* AR at 3842; *see, e.g.,* AR at 752–55 (Forest Service remarks indicating "new approach" to managing Medicine Wheel); AR at 774–75 (remarks of the Forest Service official explaining that because of letters, "we realize we were not heading in the right direction so that's why we took the draft EIS and we just set it to the side"). The Big Horn County Commissioners, the Medicine Wheel Coalition for Sacred Sites, the Medicine Wheel Alliance, and the Federal Aviation Administration (which has operated a radar site on Medicine Mountain since 1962) also became "Consulting Parties" in the development of a plan for the short-term management of the site until a long-term plan could be agreed on. *See* AR at 3842; *See also* AR at 1424–34.

In 1994, the Consulting Parties signed the Programmatic Agreement ("PA"), which established interim management procedures and contemplated the development of a long-term plan for managing the site. *See* AR at 2024–36. The Consulting Parties signed that long-term plan, the Historic Preservation Plan for the Medicine Wheel National Historic Landmark and Medicine Mountain ("HPP"), on September 28, 1996. The purpose of the HPP is "to establish a process for integrating the preservation and traditional uses of historic properties with the multiple use mission of the Forest Service, in a manner that gives priority to the protection of the historic properties involved by continuing traditional cultural use consistent with Section 110(f) of the National Historic Preservation Act." AR at 2619. The HPP provides for, *inter alia,* consultation between the Forest Service and other parties to the HPP for any project proposed with-

in an "area of consultation" surrounding Medicine Wheel. *See* AR at 2619–30. Such consultation enables the involvement and consideration of means of minimizing and mitigating impacts to historic resources and traditional cultural use. *See* AR at 2619–20. The HPP also provides for an operating plan involving on-site interpreters, visitor management, and limited motorized access, as well as protection of the traditional cultural use of the site. *See* AR at 2639–46.

The consultations and agreements culminating in the adoption of the HPP were undertaken within the framework of the Forest Service's obligations under the National Historic Preservation Act ("NHPA") and the Advisory Council's NHPA regulations. The Forest Service's obligations under the NHPA include: (1) the identification, evaluation, and management of historic properties in a way that considers preservation of their historic, archeological, architectural, and cultural values; (2) the consideration of effects of a proposed action on sites included or eligible for inclusion in the National Register of Historic Places, with an opportunity for comment by the Advisory Council, and (3) consultation with other federal, state, and local agencies, and Indian tribes in carrying out historic preservation planning activities. *See* 16 U.S.C. §§ 470f, 470h–2(a)(2); AR at 2619–20. And the Advisory Council's regulations contemplate the accommodation of historic preservation concerns through consultation between the agency, the State Historic Preservation Officer, and other interested persons, including Indian tribes, from the early stages of planning. *See* 36 C.F.R. § 800.1; *see also id.* § 800.5(e)(1) (authorizing invitation of interested persons to participate as consulting parties); *id.* § 800.13 (regulation indicating that

---

**3.** The Advisory Council is an independent agency comprised of the heads of various agencies, experts on historic preservation, and other persons appointed by the President.

agency's Section 106 responsibilities may be met through a Programmatic Agreement).

The Forest Service's management of the Medicine Wheel through the HPP has also been guided by other laws, including the Antiquities Act of 1906, the Historic Sites Act of 1935, the Archeological and Historic Resources Preservation Act of 1974, the American Indian Religious Freedom Act of 1978, and the Archeological Resources Protection Act of 1979. *See* AR at 3843. These statutes, *inter alia,* authorize the setting aside of protection of historic landmarks and structures, *see, e.g.,* 16 U.S.C. §§ 431–433m (Antiquities Act); 16 U.S.C. §§ 461–467 (Historic Sites Act), require the establishment of programs to increase public awareness of the significance of archeological resources on public lands and Indian lands and the need to protect such resources, *see, e.g.,* 16 U.S.C. § 470ii(c) (provision of Archeological Resources Protection Act), and make explicit the policy of the United States to protect the freedom of the Native Americans to exercise traditional religions through "access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites," 42 U.S.C. § 1996 (American Indian Religious Freedom Act). In addition, Executive Order 13,007 requires that federal agencies accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of such sites. *See* 61 C.F.R. 26,771–72 (1996).

Wyoming Sawmills' ("Sawmills") complaint focuses on the HPP and the Forest Service's documentation relating to its adoption, including the Environmental Assessment (AR at 2837–89) and the Decision Notice and Finding of No Significant Impact (AR at 3834–36),[4] through which the Forest Service approved the HPP and amended (Amendment 12) the existing forest plan.[5] *See* AR at 3834–36. The Complaint also challenges the Forest Service's October 1, 1997 decision to withdraw the Horse Creek timber sale, alleging that the decision effectively "[c]los[ed] Forest Development Road 11 for timber hauling." Complaint at 21. The Horse Creek timber sale, which was proposed to occur within the area of consultation, was advertised for bidding on September 19, 1997, with bids to be opened on October 20, 1997. *See* AR at 3773–74. The Forest Service canceled the sale before bids were opened because of a "procedural error on the part of the Forest Service to enter into formal consultation with the parties" to the HPP. AR at 3795–96. At the time of the cancellation, however, the Forest Service also indicated that it "plan[ned] on re-advertising this sale after consultation takes place and any potential mitigating measures if necessary are incorporated into the timber sale contract." *Id. see also* AR at 3826 (internal memorandum indicating need to avoid potential misperception by Native American groups that Horse Creek sale had been dropped permanently).

As consultation on Horse Creek got underway, the Forest Service reviewed the

---

**4.** An environmental assessment ("EA") is a document prepared pursuant to NEPA that briefly provides evidence and analysis for determining whether a proposed action will have a significant effect on the human environment. *See* 40 C.F.R. § 1508.9. A decision notice and finding of no significant impact is a document that incorporates an EA and ex-

plains why an action will not have a significant impact. *See* 40 C.F.R. § 1508.13.

**5.** A forest plan also known as a "Land Resource Management Plan," is a planning document that guides natural resource management activities on a National Forest over a ten- to fifteen-year period. *See* 16 U.S.C. § 1604.

project records for the Horse Creek Sale and concluded that it "would have a hard time" defending a decision to go forward with the timber sale project because of "process violations, conflicting data, and incomplete NEPA analysis." AR at 3831; *see also* AR at 3828–31. Many of these deficiencies stemmed from the fact that the initial NEPA analysis for the sale, and environmental assessment, decision notice, and finding of no significant impact, was prepared in 1988, and supplemental analysis was deemed insufficient to satisfy current legal standards. *See id.* No decision, however, was made to permanently cancel the project, and no decision was made to close the Forest Road 11 to any use, including logging truck traffic. *See* AR at 3824, 3832.

## STANDARD OF REVIEW

This order will employ two different standards of review because the Court is reviewing both administrative findings and deciding whether Sawmills has standing to assert its claims. With respect to the standing issues, this Court will employ the same standard of review it employs in reviewing all motions to dismiss. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[f]or the purposes of ruling on a motion to dismiss for want of standing, both the trial

and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."); *see also State of Utah v. Babbitt*, 137 F.3d 1193, 1204 (10th Cir.1998).

■ Judicial review of agency action is governed by § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Sawmills implicates the subsections of § 706 which require a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[6] "These standards require the reviewing court to engage in a 'substantial inquiry.' ... An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994); *quoting Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136, (1971).

■ Nevertheless, a court's review of an agency decision under this standard is "narrow and deferential," the court being required to uphold the agency's action if it has "articulated a rational basis for the decision and has considered relevant factors." *Mountain Side Mobile Estates*

---

**6.** 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be-
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority or limitations, or short of statutory right;
(D) without observance or procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

*Partnership v. Secretary of Housing and Urban Dev.,* 56 F.3d 1243, 1250 (10th Cir. 1995). "However, these limitations do not apply to questions of law. 'The [f]ailure to apply the correct legal standard or to provide ... a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'" *Id.; quoting Nielson v. Sullivan,* 992 F.2d 1118, 1119–20 (10th Cir.1993).

## DISCUSSION

In this case Sawmills contends that the NFS has stepped outside of the bounds imposed by the law in four ways. First, Sawmills alleges that the NFS's plan wrongfully promotes religion in violation of the establishment clause because promoting the Indian religion was a motivating factor behind NFS's decision to enact the HPP. Second, Sawmills argues that the NFS violated its own policies and procedures under the National Forest Management Act ("NFMA") because the HPP significantly changed the forest plan and the changes were not properly subjected to public notice and comment. Third, Sawmills argues the NFS violated the Federal Advisory Committee Act ("FACA") by not allowing the public to participate in discussions regarding the Big Horn forest plan. Forth, Sawmills argues that the HPP goes against the National Environmental Policy Act (NEPA) because the forest service failed to properly follow environmental procedures in enacting the HPP and HPP's *de facto* effect on logging created a greater risk of forest fires.[7] This order will deal with the standing issues associated with each of these claims in turn and then deal with merits on those claims that

the Court determines it has jurisdiction to consider.

## I. *THE TENTH CIRCUIT LAW ON STANDING*

Standing " 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Warth,* 422 U.S. at 498, 95 S.Ct. 2197. The notion of standing is grounded in Article III of the U.S. Constitution, which restricts federal court adjudication to actual cases or controversies. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The doctrinal foundation of Article III standing is the principle of separation of powers. *See id.* at 750–52, 104 S.Ct. 3315.

Standing is but one of several gatekeepers " 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Id.* at 750, 104 S.Ct. 3315; *quoting Warth,* 422 U.S. at 498, 95 S.Ct. 2197 (1975). "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Id. quoting Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.1982) (Bork, J., concurring).

Because plaintiffs have invoked Article III jurisdiction to challenge the conduct of the executive branch of government, the necessity of a case or controver-

---

**7.** Sawmills' argument that the HPP increased the possibility of forest fires because it limited logging in Big Horn National Forest was not briefed or raised until oral argument. Furthermore, the issue was not raised at the administrative level. This Court only reviews the administrative court's decision. It does not decide issues that Sawmills did not raise at the administrative hearing.

sy is of particular import. *See Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 804 (11th Cir.1993). The warnings against unrestrained exercise of the power of judicial review over the conduct of the executive or congressional branches by relaxation of the standing requirements are numerous and dire. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 473–74, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *United States v. Richardson,* 418 U.S. 166, 188–93, 94 S.Ct. 2940, 2952–55, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Restraint in the exercise of judicial review preserves not only the power and vitality of the judiciary, but that of each of the other two coordinate branches of federal government as well. *See Valley Forge,* 454 U.S. at 474, 102 S.Ct. 752; *Richardson,* 418 U.S. at 188–89, 94 S.Ct. 2940. Standing to invoke the power of the federal courts is not a mere technical hoop through which every plaintiff must pass, but rather is "a part of the basic charter promulgated by the Framers of the Constitution." *Valley Forge,* 454 U.S. at 476, 102 S.Ct. 752.

 Standing is not measured by the intensity of a party's commitment, fervor, or aggression in pursuit of its alleged right and remedy. *See Doremus v. Board of Educ.,* 342 U.S. 429, 434–35, 72 S.Ct. 394, 96 L.Ed. 475 (1952); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 225–26, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Valley Forge,* 454 U.S. at 485–86, 102 S.Ct. 752; *Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). Nor is the perceived importance of the asserted right a substitute for constitutional standing. *See Valley Forge,* 454 U.S. at 484–85, 102 S.Ct. 752. The argument that no other person is better suited to bring the lawsuit is equally una-

vailing. *See id.* at 489, 102 S.Ct. 752 (" '[T]he assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing.' " *quoting Schlesinger,* 418 U.S. at 227, 94 S.Ct. 2925). "Notwithstanding its prominent gatekeeping role, the standing requirement of Article III should never be interpreted to bar a party properly before the court from invoking the power of judicial review." *State of Utah v. Babbitt,* 137 F.3d 1193, 1202 (10th Cir.1998).

 To satisfy the standing requirement of Article III, plaintiffs must demonstrate the following:

(1) that the plaintiff[s] have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is

 (a) concrete and particularized and

 (b) actual or imminent, not conjectural or hypothetical;

(2) that there is a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and

(3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Phelps v. Hamilton,* 122 F.3d 1309, 1316 (10th Cir. 1997). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130. The burden is therefore on plaintiffs " 'clearly to allege facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute.' " *United States v. Hays,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132

L.Ed.2d 635 (1995) *quoting Warth,* 422 U.S. at 518, 95 S.Ct. 2197.

■ In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. 752. These prudential principles include "the general prohibition on a litigant's raising another person's legal rights [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen,* 468 U.S. at 751, 104 S.Ct. 3315. "[U]nlike their constitutional counterparts, [these prudential requirements] can be modified or abrogated by Congress." *Bennett v. Spear,* 520 U.S. 154, 164–65, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

## A. *The Establishment Clause Claim*

Sawmills' first claim for relief is based on the establishment clause of the first amendment. Sawmills alleges that the HPP closed several roads that were previously open to commercial logging, caused the Forest Service to cancel its Horse Creek timber sale, and requires the Forest Service to expend tax dollars on educating tourists about the Indian religion. Sawmills claims that these actions violate the establishment clause, and prays for this Court to strike down the HPP.

### 1. *Standing*

As stated above, Article III standing requires this Court to employ a three prong test. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. The burden of proving that it has standing is on Sawmills. First, Sawmills must demonstrate that it has suffered an *injury in fact. See id.* An injury in fact must be concrete and particularized, not abstract and general. Second, Sawmills must show that the HPP *caused* its injury. *See id.* Third, Sawmills must show that this Court could *redress* its injury by striking down the HPP. *See id.*

### a. *Injury in Fact*

■ In support of its assertion that it has standing to raise the establishment clause issue, Sawmills alleges, in its complaint, that it has suffered five injuries as a result of the HPP:

- Closure of the Forest Development Road (FDR) 12 created a *de facto* change in the designation of federal lands to the Northeast of Medicine Wheel. Complaint ¶ 17;

- Closure of FDR 11 constitutes a *de facto* change in the designation of the 30,000 acres of Big Horn lands it serves. Complaint ¶ 21;

- Cancellation of the Horse Creek timber sale and the *de facto* closure of portions of the Big Horn National Forest to legal timber harvest were "undertaken for the sole purpose of furthering Native American religions." Complaint, [sic] ¶ 24. [sic]

- The Programmatic Agreement, the HPP, and Forest Plan Amendment close areas of a multiple-use forest to legal timber harvesting for purposes of promoting Native American religions. Complaint, [sic] ¶ 26. [sic]

- Defendants' actions violate the Establishment Clause. Complaint, [sic] ¶ 29.

Response to the Defendant's Motion to Dismiss ("Response") at 7.[8] Furthermore, Sawmills claims that it suffered three additional injuries that are unique to the establishment clause in its Response. *See* Re-

---

8. Hereafter, the order will refer to these inju- ries as the complaint injuries.

sponse at 3–7. First, it claims that the HPP prevented it from freely using public areas. *Id.* at 3. Second, it claims that it has suffered an injury because it is placed in direct contact with unwelcomed religious symbolism endorsed by the United States. *Id.* at 5. Third it alleges that it suffers an injury as a taxpayer because the HPP directs funds for "interpreters" at the Medicine Wheel. *Id.* at 6.

This order deals with the injuries stated in Sawmills' complaint as one injury. In general, Sawmills alleges that it is injured because the HPP *de facto* changes the designation of the Big Horn National Forest because the closure of FDR 12 effectively eliminates the possibility of logging in the parts of Big Horn accessed by those roads. Furthermore, it claims that it suffered an injury because the NFS canceled the Horse Creek Timber sale.

■■■■■ To establish an injury in fact, Sawmills must show "a distinct and palpable injury to itself." *Glover River Org. v. United States Dep't of Interior,* 675 F.2d 251, 255 (10th Cir.1982). An abstract injury is not enough; "the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Although "[a]n asserted right to have the Government act in accordance with the law is not sufficient, standing alone, to confer jurisdiction on a federal court," courts will generally find an injury in fact if the plaintiff can demonstrate a plausible benefit. *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). For example, in *Watt,* the Supreme Court held

that the State of California had standing to challenge the Secretary of the Interior's failure to comply with a statute requiring it to experiment with different royalty systems in leasing offshore gas and oil production rights. *See Watt,* 454 U.S. at 160–62, 102 S.Ct. 205. Although a judgment would require the Secretary only to perform the experiments and would not guarantee the state any royalties, the Court determined that the State's loss of an opportunity for benefit constituted an injury in fact. *See id.*

In this case, Sawmills' complaint injuries are that it lost the ability to log off road 12 because the HPP closed road 12 to logging traffic. The facts do not suggest that Sawmills had an entitlement to log anywhere in Big Horn National Forest. Even so, Sawmills could potentially have earned the right to log in Big Horns if it submitted a successful bid to the NFS. Therefore, the HPP caused Sawmills to lose the opportunity to bid, much like the Secretary of Interior's decision in *Watt,* caused the state of California to lose the benefit of experimenting with different royalty systems. Therefore, the Court finds that Sawmills has suffered an injury in fact with respect to its complaint injuries.

■■■■■ Sawmills' first injury as stated in its Response is that the HPP prevented it from freely using public areas. Sawmills cites authority that provides a lax standard for injuries in the context of establishment clause violations. *See* Response at 3–4. Sawmills, however, misstates the standard. Sawmills alleges that a plaintiff has standing to bring an establishment clause claim if a regulation prevents a plaintiff from freely using public areas.[9] This proposition is correct, in part.

9. Sawmills cites *Hewitt v. Joyner,* 940 F.2d 1561, 1564 (9th Cir.1991) in support of its proposition. This case, however, is neither binding nor persuasive authority to this Court because it was decided on California State

The Tenth Circuit requires the regulation to prevent a plaintiff from freely using public areas *because the plaintiff is offended by the religious symbolism that the regulation advances.* See Robinson v. City of Edmond, 68 F.3d 1226, 1228 (10th Cir.1995) (finding standing where plaintiff lived and worked in a city displaying a religious symbol in its official seal); *Foremaster v. City of St. George,* 882 F.2d 1485, 1489 (10th Cir.1989).

In *Robinson,* City of Edmond residents brought suit against the city alleging that the City seal violated the establishment clause because it contained a cross on the left-side of the seal. See Robinson, 68 F.3d at 1228. The Tenth Circuit found that plaintiffs were in direct contact with the seal because it was prominent throughout the city. Furthermore, the court found that the seal was offensive to the plaintiffs because it was a religious symbol. *See id.* Since plaintiffs were both in direct contact with the seal and were offended by it, the Tenth Circuit held that they suffered an injury sufficient to bring an establishment clause claim because they were in direct contact with a religious symbol and were offended by the religious symbol. *See id.* at 1232–33.

Here, the HPP does not advance any religious symbolism. Unlike the cases Sawmills cited, the HPP did not erect any religious symbol anywhere in Big Horn National Forest. Rather the HPP closed several roads and created a buffer zone around the Medicine Wheel. Furthermore, Sawmills does not allege that the Medicine Wheel itself offends it.[10] Even if it did, this Court could not redress that injury because even if it struck down the HPP it could not eliminate the Medicine Wheel as it is a protected National Monument. Furthermore, contrary to Sawmills' belief, it cannot assert constitutional standing based solely on the governments failure to act in accordance with the law. *See Babbitt,* 137 F.3d at 1205 *quoting Allen,* 468 U.S. at 754, 104 S.Ct. 3315 ("an asserted right to have the Government act in accordance with the [law] is not sufficient, standing alone, to confer jurisdiction on a federal court").

Sawmills' second injury as stated in its Response is that it is in direct contact with the effects of the HPP and it is offended by those effects. Like the problem above, Sawmills does not assert the necessary elements of an injury. Sawmills claims that its direct contact with the effects of the HPP constitutes an Article III injury.[11] Once again that is half of the

---

Constitutional grounds; not the federal Constitution.

**10.** It is not clear whether a corporation has the capacity to be offended by religious symbolism as it is a fictitious person. Sawmills argues that the Supreme Court has held that a Corporation could suffer an establishment clause injury. *See Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (striking down Texas law that excluded religious magazines from state sales tax). In *Bullock,* the Court did find that a corporation had standing to sue, but the injury in that case was monetary, not offensiveness caused by direct contact with religious symbolism. Therefore, this Court be-

lieves that the law is not settled on whether a corporation could be religiously offended.

**11.** Sawmills fails to cite a single Tenth Circuit case that employs this standard. Rather, Sawmills cites a Supreme Court case and a Fourth Circuit case. *Abington v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Suhre v. Haywood County,* 131 F.3d 1083, 1086 (4th Cir.1997). In *Abington,* the Supreme Court struck down a school prayer statute, without discussing any standing issues. Even though the Court discussed only the merits, its opinion focused on the impact of school prayer on students and parents who were not Christian. In *Suhre,* the Fourth Circuit held that intangible harm could constitute an injury in fact, but further found that

Tenth Circuit law. In addition to being in direct contact with the offensive symbolism, the symbolism must offend the plaintiff for the plaintiff to suffer an injury. *See Foremaster,* 882 F.2d at 1491. In other words, religious symbolism without personal offense caused by that symbolism is not sufficient to constitute an injury in fact. *See id.*

Sawmills does not allege that Medicine Wheel offends it. Furthermore, it is unclear whether a for profit corporation has the capacity to be offended. Even if Medicine Wheel offended Sawmills this Court could not redress that injury because striking down the HPP would not do away with the Medicine Wheel.

▉▉▉ Sawmills' third injury as stated in its Response is that the NFS's use of tax dollars to further the Native American religion violates the establishment clause. The Supreme Court announced a special standing analysis for persons asserting standing as taxpayers. *See Valley Forge,* 454 U.S. 464, 478–79, 102 S.Ct. 752 ("a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution... [the taxpayer would also have to] show that the challenged enactment exceeds specific constitutional limitations upon the exercise of the taxing and spending power and not simply that the enactment is generally beyond the powers delegated to the Congress by Art. I, § 8."); *Flast v. Cohen,* 392 U.S. 83, 88, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In *Valley Forge,* an organization that advocated the separation of church and state, challenged the Secretary of Health, Education, and Welfare's decision to convey a "surplus" military hospital to a church-related col-

lege without compensation. *See Valley Forge,* 454 U.S. 464, 467–68, 102 S.Ct. 752. The organization argued that it had standing because its tax dollars were used to purchase and create the hospital and the government's subsequent grant of the hospital to a church-related college without compensation violated the establishment clause. *See id.* at 468, 102 S.Ct. 752.

The Supreme Court gave four reasons why the organization did not have standing to challenge the conveyance. Two of the reasons are directly relevant to the taxpayer standing issue in the instant case. First, the Court found that the organization was not challenging a congressional action but rather an executive decision to transfer a parcel of federal property. *See id.* at 479, 102 S.Ct. 752. The Court stated that a plaintiff, alleging standing as a taxpayer, could challenge *only* congressional Acts. Because the organization was challenging an administrative Act, the Court held that the organization did not have standing to challenge the action. *See id.*

Second, the Court found that the organization was challenging an exercise of the Property Clause, Art. IV, § 3, cl. 2 because the organization was challenging the conveyance of the hospital. *See id.* at 480, 102 S.Ct. 752. The Court held that because the organization was not challenging a congressional decision to spend under Art. I, § 8, it did not have standing. *See id.*

Here, Sawmills challenges a NFS act, the passage of the HPP. The NFS is an administrative agency. Sawmills is not challenging a congressional action. Furthermore, NFS did not enact the HPP, which includes a grant for "interpreters" to educate visitors of Medicine Wheel

being offended is the intangible harm necessary to constitute an establishment clause in-

jury.

about Medicine Wheel, pursuant to Congress' taxing and spending power. Rather, NFS enacted the HPP pursuant to its own regulatory authority. Therefore, this Court finds that Sawmills does not have taxpayer standing to challenge the HPP because Congress did not enact it and it is not an exercise of its taxing and spending powers.[12]

### b. *Causation*

 Sawmills has shown an injury in fact only with respect to its Complaint injuries, but not with respect to its Response injuries. Nevertheless, this order will discuss causation in this section and redressability in the following section with respect to all the injuries. It is important to note that Sawmills must satisfy all three essential elements for standing because the standing inquiry is a conjunctive inquiry, not a disjunctive one. *See Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130.

To prove causation, Sawmills must show that its injuries were caused by the HPP. *See id.* In the realm of standing, causation simply means that the challenged action caused the plaintiff's injury. *See id.* Assuming that all of the asserted injuries above were injuries in fact, then it cannot be disputed that the HPP caused the injuries stated in the complaint and Sawmills' injury as a taxpayer. This is because the *status quo*, as Sawmills characterizes it, changed as a result of the HPP.

Nevertheless, the HPP did not cause Sawmills' injury of being offended to the point that it has to avoid that area of Big Horn National Forest and it is Sawmills' direct contact with the Medicine Wheel that offended it. Congress designated Medicine Wheel as a National Monument before NFS passed the HPP. Therefore, even if those injuries constituted standing sufficient injuries, the HPP did not cause those injuries.

### c. *Redressability*

 The third inquiry in a standing analysis is whether the plaintiff's sought remedy would redress its injuries. An injury is redressed when there is a " 'substantial likelihood' that the relief requested will redress the injury claimed...." *See Baca*, 92 F.3d at 1036. "[T]he loss of the possibility of obtaining a federal lease is not redressable by a favorable decision." *Mount Evans v. Madigan*, 14 F.3d 1444, 1451 (10th Cir.1994); *see also State of Wyoming v. Lujan*, 969 F.2d 877, 882 (10th Cir.1992); *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868 (10th Cir.1992).

In *Baca*, the plaintiff challenged the Secretary of Interior's decision to sell private property that he leased to private individuals. *See Baca*, 92 F.3d at 1036–37. The Tenth Circuit found that the plaintiff had no right to renew the lease at the end of the term, that the government properly terminated the lease, and that the court had no authority to order the agency to grant the plaintiff the lease. *See id.* at 1037 ("No court has the power to order the BLM or the Department of the Interior to grant Mr. Baca another grazing lease, because the very determination of whether to renew grazing permits and whether public lands should even be designated for grazing purposes are matters completely within the Secretary of Interior's discretion"). Therefore, the court held that the plaintiff did not have standing to challenge the sale because a favorable decision could not re-

---

**12.** This order will address the causation and redressability issues with respect to the all other alleged injuries. With respect to the taxpayer standing issue, however, the *Valley* *Forge* test is dispositive. Therefore, this order will not devote further discussion to this issue.

dress his injury of losing the leased property.

Sawmills' complaint injuries are that the HPP effectively barred parts of the Big Horn National Forest to logging. Sawmills alleges that those areas were designated for both logging and recreation and that the *de facto* change in its designation injures Sawmills because as a logging company it has lost potential logging area. However, nothing in the designation of Big Horn National Forest entitled Sawmills with a right to log, just a possible right to log.[13] If this Court strikes the HPP, Sawmills will be in the same position it is now in that striking the HPP would not guarantee Sawmills the right to log in Horse Creek. Since striking down the HPP will not grant Sawmills a right to log, this Court cannot redress Sawmills' complaint injuries.

Furthermore, striking down the HPP will not redress Sawmills' first two Response injuries because Congress' decision to designate Medicine Wheel as a National Monument caused those injuries, not the HPP. Therefore, a favorable ruling by this Court will not redress any of Sawmills' injuries.

## B. The APA claim regarding the National Forest Service Management Act NFSMA.

Sawmills second claim for relief is based on NFS's failure to follow its own regulations. *See* Response at 11; *see also Webster v. Doe*, 486 U.S. 592, 602 n. 7, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (recognizing the right of federal courts to review an agency's actions to ensure that it has followed

its own regulations); 5 U.S.C. § 706(2)(A), (D).

### 1. *Standing*

The APA provides that "[a] person suffering legal wrong because of agency action...is entitled to judicial review thereof." 5 U.S.C. § 701. To establish standing under the APA, Sawmills must show that it has "suffered legal wrong" or is "adversely affected or aggrieved by action within the meaning of a relevant statute." *See Valley Forge*, 454 U.S. at 487 n. 24, 102 S.Ct. 752; *Southern Utah Wilderness Alliance v. Thompson*, 811 F.Supp. 635, 640 (D.Utah 1993). To establish a grievance within the meaning of the relevant statute, Sawmills must show that its injury is "arguably within the zone of interests to be protected or regulated by the statute," in addition to the Article III standing requirements. *See Valley Forge*, 454 U.S. at 487 n. 24, 102 S.Ct. 752 ([n]either the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III); *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1055 (10th Cir.1993). Sawmills must also show that there has been some "final agency action." *See Babbitt*, 137 F.3d at 1203. Since the NFMA does not provide for judicial review of Forest Service decisions general provisions of the APA apply.

Sawmills alleges that it suffered a legal wrong and has been adversely affected by NFS's failure to follow the proper procedures in each of its actions that amended the Forest Plan and changed management prescriptions. Sawmills also alleges that Forest Plan Amendment 12 constituted a final agency action and that timber rights

---

**13.** Similar to *Baca* the decision to designate an area of the Big Horn National Forest for logging is solely and completely within the Secretary of Interior's discretion. *See* 43 U.S.C. §§ 315, 315b.

are within NFMA's zone of interest.[14] As such, Sawmills claims that it has standing to challenge Amendment 12.

NFS does not dispute the fact that the HPP and Amendment 12 are final agency actions and that timber interests generally fall within the NFMA zone of interests. Nevertheless, NFS argues that Sawmills does not have standing to challenge Amendment 12 because it failed to satisfy Article III standing.

■■■ As demonstrated above, Sawmills has not satisfied the Article III standing requirements because it has not shown that it has suffered an injury that this Court could redress with a favorable decision. *See Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130. Sawmills, however, has demonstrated an injury in fact in that the HPP closed road 12; thereby, limiting the ability to log in areas accessed by road 12. *See supra*, at 1293. Moreover, Sawmills' NFMA claim seeks to enforce a procedural right. In *Defenders of Wildlife*, the Supreme Court stated that lesser redressability standards apply when a plaintiff seeks to enforce a procedural right:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact

statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even thought the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the government's argument that, *even if* the other agencies were obliged to consult with the Secretary, they might not have followed his advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected-persons who live (and propose to live) at the other end of the country from the dam.

*Defenders of Wildlife*, 504 U.S. at 573 n. 7, 112 S.Ct. 2130. Under this lenient standard of redressability, this Court finds that Sawmills has standing to challenge the NFS under NFMA.[15]

## C. Sawmills' Federal Advisory Committee Act ("FACA") Claim

■■■ The standing analysis under FACA is similar to the NFMA claim because FACA like NFMA does not have an enforcement provision. As such, all FACA claims fall under the APA.

Here, Sawmills claims that it suffered an injury because it was denied a right to participate in the planning of the HPP or Amendment 12. Sawmills argues it had a right to participate in the planning of the HPP and Amendment 12 because the "Consulting Parties" constituted an advisory group under FACA. It seeks an injunction to the HPP and Amendment 12 in order to cure this procedural error.

---

**14.** Amendment 12 amended the forest plan to implement the HPP.

**15.** This Court does not find that NFS's withdrawal of the Horse Creek timber sale to be a final agency action because the terms of the cancellation are plainly temporary and sub-

ject to rebidding after further consultation. *See* AR at 3828. Therefore, the Court holds that it does not have standing to review Sawmills' claim that NFS violated the NFMA by withdrawing the Horse Creek timber sale.

This Court does not believe that it can redress Sawmills' injuries by granting an injunction against the HPP or amendment 12 because doing so would not necessarily reinstate the Horse Creek timber sale. Nevertheless, the Court finds that Sawmills has standing under FACA because the ability to correct a procedural error is sufficient, on its own, to satisfy Article III standing requirements. *See Defenders of Wildlife,* 504 U.S. at 573 n. 7, 112 S.Ct. 2130.

### D. *Sawmills' National Environmental Policy Act ("NEPA") Claim*

Sawmills third claim for relief is based on NFS's failure to enact a plan that furthers the goals of the NEPA. Sawmills argues that the HPP limits the timber harvesting area in Big Horn National Forest and as such, increases the risk of forest fire. It claims that it has standing under NEPA to challenge the HPP because it is located near Big Horn National Forest and is directly impacted by the increased possibility of forest fire. The analysis for NEPA claims are similar to the analysis used for APA claims.

#### 1. *Standing*

In order to challenge the HPP and Amendment 12 under the NEPA, Sawmills must allege that its injury is within the zone of interests protected by NEPA; in addition to satisfying the Article III standing requirements. *See States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996).[16] "Congress en-

acted the NEPA in order to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The purpose of the NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions. *See Glickman,* 92 F.3d at 1235–36. Therefore, a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA. *See id.*

As a first step, Sawmills must show that it has Article III standing. *See id.* at 1232. Sawmills alleges that it has suffered an injury because the HPP increased the chances of forest fire. This injury, however, is not sufficiently concrete to constitute an Article III injury. As stated above, an "injury in fact" must be imminent not speculative. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. Here, the chance of fire at a particular location within the Big Horn National Forest is too remote to constitute an injury. *Compare City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (finding that threat of choke-hold is too remote to constitute an imminent injury sufficient for injunctive relief because the possibility of police choking the same plaintiff again was in the millions) *with Glickman,* 92 F.3d at 1233 (finding injury in fact even though threat of harm from forest fire was remote). Even if the increased possibility of forest fire was an injury in fact, striking down the HPP would not decrease that risk

---

**16.** Note that in *Glickman* the D.C. Circuit found that "on any given claim the injury that supplies constitutional standing" must be the same as the injury within the requisite "zone of interests" for purposes of prudential standing." *See Glickman,* 92 F.3d at 1232. Unlike the plaintiffs in *Glickman,* Sawmills did not allege that it suffered an aesthetic injury because of the increased risk of forest fire any-

where in its complaint. Sawmills did attempt to amend its complaint to allege such injuries, but this court denied its motion for leave to amend because it held that it was untimely. Furthermore, unlike *Glickman,* Sawmills did not submit any affidavits supporting the proposition that it may suffer an aesthetic loss because it uses Big Horn National Forest for recreational purposes.

because it would not guarantee that the NFS would grant logging contracts. *See Madigan*, 14 F.3d 1444, 1451. Therefore, the harm is not redressable and Sawmills does not have Article III standing.

 Assuming that Sawmills demonstrated Article III standing, it must still demonstrate that striking the HPP is in the NEPA's zone of interest. *See Glickman*, 92 F.3d at 1235–36. To do so, Sawmills must show that it has more than an economic interest in logging. *See id.* at 1236. Sawmills admits that the primary injury it suffered is economic, but contends that the HPP and Amendment 12 also affect the "human environment" of Sawmills employees and has therefore caused a lifestyle loss as well as economic loss. Sawmills, however, is the only named plaintiff in this suit. This Court denied Sawmills' attempt to amend its complaint to join individuals who have aesthetic interests in Big Horn National Park. As such, Sawmills' complaint alleges only an economic injury. As stated above, an economic injury is not enough to place Sawmills' interests within the NEPA's zone of interests. Therefore, Sawmills also lacks prudential standing to sue under the NEPA.

## II. THE NFMA AND FACA CLAIMS ON THE MERITS

As discussed above, this Court finds that it has standing over two of Sawmill's four claims; namely, the NFMA and FACA claims. Below, the order will discuss these claims in turn. As discussed above, the appropriate standard for judicial review of NFS's action is the arbitrary and capricious standard of the APA. *See* 5 U.S.C. § 706(2)(A) & (C); *see also Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 It is well-established that this standard is one of deference, and that the party claiming that the action was arbitrary or capricious must overcome a significant hurdle. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. "All the agency need do is demonstrate it considered relevant factors and alternatives after a full ventilation of the issues, and that the choice[s] it made [were] reasonable based on these considerations." *Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 643 (10th Cir.1990); *citing American Mining Congress v. Marshall*, 671 F.2d 1251, 1255 (10th Cir.1982). Further, this Court "is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. Its task is simply to determine whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.; Gallegos v. Lyng*, 891 F.2d 788, 790 (10th Cir.1989). The Court's review of the agency action is limited to the record before the agency at the time the agency made its decision. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

### A. *The NFS Fully Complied with the NFMA.*[17]

 The Multiple–Use Sustained Yield Act ("MUSYA") provides for the management of the national forests. It directs the NFS to "best meet the needs of

---

17. Sawmills argues that amendment 12 violates both the APA and the NFMA. These arguments, however, do not involve distinct claims; because the NFMA lacks a judicial review provision, the allegations all relate to a single claim under the APA. *See Sierra Club v. Marita*, 46 F.3d 606, 610 n. 3 (7th Cir.1995).

the American people [and] mak[e] the most judicious use of the land" under its jurisdiction. 16 U.S.C. §§ 528–531. The uses expressly authorized are diverse and include outdoor recreation, range, timber, watershed, and wildlife and fish. *See 16 U.S.C. § 528.*

Under the NFMA, the NFS conducts planning and resource management in each unit of the National Forest System through a land resource management plan (forest plan), which provides overall direction and general guidelines for natural resources management for up to fifteen years. *See 16 U.S.C. 1604; see also Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Each forest plan contains a summarized analysis of the management situation, forest multiple-use goals and objectives, including a description of the desired future condition of the forest and an identification of goods and services that are expected to be produced, multiple-use prescriptions, standards and guidelines, and monitoring and evaluation requirements. *See* 36 C.F.R. § 219.11.

### 1. *Procedures NFS must follow in amending a forest plan and the definition of a "significant impact"*

Forest Service regulations provide that a forest plan may be amended. *See* 36 C.F.R. § 219.8. The procedure that the NFS must follow with respect to amending a forest plan, depends on whether the amendment is deemed as significant. The regulation states, "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan, the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan." *Id.* "If the

change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow the same procedure as that required for development and approval of a forest plan." *Id.* This includes a procedure that involves identification by an interdisciplinary team of purpose and need, the adherence to specific planning criteria, the formulation and evaluation of alternatives, the preparation of an environmental impact statement pursuant to NEPA, and approval by the Regional Forester. *See id.* § 219.10(b), (c); *id.* § 219.12. If the change is determined to be nonsignificant, it may be implemented "following appropriate public notification and satisfactory completion of NEPA procedures." *Id.* § 219.10(f). The Forest Service Handbook provides guidelines for determining whether a forest plan amendment is significant based on such factors as timing, location and size, goals and objectives, and management prescriptions. *See* Forest Services Handbook 1901.12, ch. 5.32(3).

The Handbook lists "[t]he following factors...to be used when determining whether a proposed change to a forest plan is significant or not significant:"[18]

a. Timing. Identify when the change is to take place. Determine whether the change is necessary during or after the plan period (the first decade) or whether the change is to take place after the next scheduled revision of the forest plan. In most cases, the later the change, the less likely it is to be significant for the current forest plan....

b. Location and Size. Determine the location and size of the area involved in the change. Define the relationship of the affected area to the overall planning area...

---

**18.** The Handbook provides that "[o]ther factors may also be considered, depending on the circumstances." Forest Service Handbook 1909, 12, ch. 5.32(3).

c. Goals, Objectives, and Outputs. Determine whether the change alters long-term relationships between the levels of goods and services projected by the forest plan.

d. Management Prescription. Determine whether the change in a management prescription is only for a specific situation or whether it would apply to future decisions throughout the planning area. Determine whether or not the change alters the desired future condition of the land and resources or the anticipated goods and services to be produced.

### 2. *Amendment 12 is a nonsignificant change to the forest plan*

The first factor the NFS must consider in determining whether an amendment is significant is timing. The forest plan at issue was adopted in 1985. AR 3892. The changes effected by Amendment 12 occurred after the first decade that the forest plan was in place and late in the planning period. This supports a finding of nonsignificance. *See* Forest Service Handbook 1909.12, ch. 5.32(3)(a).

Second, the size of the area affected is relatively small when compared to the overall planning area, *see id.* ch. 5.32(3)(b) ("Define the relationship of the affected area to the overall planning area"). The entire 18,000 acres within the Area of Consultation comprises only 1.6% of the total acreage within the Big Horn National Forest. AR at 3891. Sawmills contends that "[t]he affected area comprises at least 10 to 15 percent of the Big Horn's total acreage designated as available for timber production." Even if this figure is accurate, it is irrelevant because the proper inquiry is to compare the affected area to the overall planning area. Here, the affected area is only 1.6% of the total planning area. This figure supports a finding of nonsignificance. *See* Forest Service handbook 1909.12, ch. 5.32(3)(b).

Third, the Forest Service concluded that Amendment 12 would have "very few direct, indirect, or cumulative effects to the goals, objectives, or outputs projected in the Forest Plan" because the "amendment is specific in nature and affects only a small area for a specific situation." AR at 3839. This Court agrees that the Amendment is specific in nature and affects only a specific area as it affects only those portions of Big Horn National Forest that are adjacent to the Medicine Wheel. Nevertheless, Sawmills argues that Amendment 12 affects outputs of timber because it may limit areas of logging within Big Horn National Forest because it close road 12 to log hauling.[19] This Court finds Amendment 12 does limit logging, however, the effect is not significant. NFS reasonably determined that the potential decrease in timber output was nonsignificant because it found that only 10% of the area within the 18,000 acres of the area of consultation was suited for logging. *See* AR at 2672; *c.f.* AR at 2818 (Sawmills' appeal of finding of no significant impact stating that more than 10% of the are of consultation is suitable for logging).[20] This

---

**19.** It is important to note that Sawmills failed to reveal that any log hauling ever took place on road 12. *See* AR at 2837.

**20.** This Court acknowledges that there is a dispute regarding this point, however, Sawmills' arguments are conclusory and do not cite authority or figures in support of its position that more than 10% of the area of consul-

tation is suitable for logging. This Court is not a forestry expert and is not able to make that determination on Sawmills' bare allegations. Therefore, the court will defer to the NFS's findings because it reviews under a deferential standard.

is equivalent to only 1,800 acres in the entire forest. Furthermore, the administrative court found that NFS's closure of road 12 did not eliminate the possibility of logging within the area of consultation, but rather placed a temporary restriction on logging until NFS identified alternative routes to the timber areas. *See* AR 2828, 2833. Consideration of the "Goals, Objectives, and Outputs" factor also supports the nonsignificance determination. *See* Forest Service Handbook 1909.12, ch. 5.32(3)(c).

Fourth, the Forest Service determined that the change in the management prescription is only for a specific situation. *See* AR at 5334; AR at 3891. The administrative court repeatedly stated that the HPP only affected the area of consultation in order to comply with the American Indian Religious Freedom Act, the National Historic Preservation Act, and the federal laws and policies. *See* AR 2827. Moreover, the administrative court stated that long term goal of the HPP "is to develop alternative access to achieve more effective protection and management." *Id.* The administrative record is full of documents and findings that support the administrative court's decision. *See, e.g.,* AR at 2384–2385. Therefore, the "Management Prescription" factor balances in favor of a nonsignificance determination.

In addition to its claim that Amendment 12 was a significant change in the forest plan, Sawmills argues that NFS violated public participation requirements of the NFMA in enacting Amendment 12. This Court finds that NFS did not err in determining that Amendment 12 was nonsignificant. Therefore, NFS did not have to allow for meaningful public participation under the NFMA; it had only to provide appropriate public notification and it had to satisfactorily complete NEPA procedures. *See* C.F.R. § 219.10(f).

 The NFS's actions here readily meet that standard. The NFS has kept the public notified of the development of the HPP and management pursuant to it, and it has afforded the public ample opportunities to participate in the planning process. The PA and HPP were developed in response to numerous public comments critical of an earlier proposal described in the 1991 DEIS, and the PA and HPP took into account public concerns.[21] Moreover, the Forest Service's release of NEPA documents allowed the public an adequate opportunity to comment on the adoption of the HPP. *See* AR 2498–99 (press release announcing completion of the draft EA and inviting comments). Indeed, Sawmills itself admits that it "has participated in the planning for the Medicine Wheel National Historic Landmark and submitted comments on the draft Environmental Assessment for this decision." AR at 2803. In one instance of such participation, the Forest Service Supervisor and District Ranger met specifically with the Plaintiff on June 24, 1996 to discuss the HPP and to solicit its input. *See* AR at 2826. At this meeting, Sawmills was "given a draft of the proposed vegetation and timber management sections of the proposed HPP to

---

21. *See, e.g.,* AR at 1154–61, 1189, 1232 (describing February 1993 "strategy development workshop," which was open to the public and attended by numerous individuals and representatives of different interests); AR at 1763 (press release describing January 1994 meetings, including forum open to public); AR at 2784 (noting that "scoping has been ongoing [since 1988] and has included meetings, press releases, radio and television coverage, and articles in local and regional newspapers"); AR at 2898 (describing "intense public involvement encompassing not only local citizens, state and local governments, Indian tribes, other Federal agencies, environmental and industry organizations, but literally the world").

review" and was "asked to participate and attend future information sharing meetings." *Id.*

In lieu of the foregoing paragraphs, the Court finds that NFS provided sufficient public notification of the forest plan and properly followed NEPA procedures. Therefore, the Court holds that the NFS did not act arbitrarily, capriciously, or abuse its discretion by finding that it properly followed the necessary notification procedures.[22]

**B. Consultations Pursuant to the PA and the HPP Were Not, And Are Not Subject to the Requirements of the Federal Advisory Committee Act.**

■ The FACA passed to establish Congressional oversight of the use of advisory committees by the executive branch. FACA imposes a number of requirements on advisory groups subject to its provisions regarding such matters as advance notice of committee meetings, the keeping of public availability of minutes, and the composition of advisory group membership. *See* 5 U.S.C.App. II §§ 2, 9–14. Although the language of the statute suggests a broad range of applicability, the Supreme Court has rejected a literal application of FACA because it would "cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Public Citizen v. United States Dep't of Justice,*

491 U.S. 440, 453, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989).

**1. Consultations here are exempt from FACA**

FACA contains a number of exemptions that limit its applicability. *See, e.g.,* 5 U.S.C.App. II § 4. The consultations here among the "Consulting Parties" to the HPP are exempted from the requirements of FACA under one such exemption for intergovernmental consultations. Under that exemption, the statute's requirements do not apply to:

actions in support of intergovernmental communications where—

(1) meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities; and

(2) such meetings are solely fore the purpose of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration.

2 U.S.C. § 1534(b).

■ This exemption from FACA, was enacted as part of the Unfunded Mandates Reform Act ("UMRA") of 1995.[23] Under

---

**22.** Sawmills also alleges that the NFS violated the NFMA by not considering a reasonable range of alternatives before approving Amendment 12. Because the Court has held that Amendment 12 was not a significant change, the NFS did not have to comply with that portion of NEPA. Furthermore, this Court does not have jurisdiction to adjudicate the NEPA claim, as a stand alone claim, because this Court has held that Sawmills does not have standing to challenge the NFS under NEPA.

**23.** Even though the NFS passed the HPP before the enactment of the UMRA, it retroactively applies in the instant case because the intergovernmental exemption was passed to "clarif[y] Congressional intent" with respect to intergovernmental communications, H.R. Conf. Rep. 104–76, at 40 (Mar. 13, 1995).; *see also Farmers Tel. Co. v. FCC,* 184 F.3d 1241, 1250 (10th Cir.1999) (rule that merely clarifies or explains existing law is "interpretive rule" that may be applied to pre-rule facts without raising retroactivity concerns).

the well-established principles of administrative interpretation, such regulatory guidance is to be accorded substantial deference by the judiciary. *See Chevron, U.S.A., v. Natural Resources Defense Council* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The guidelines and instructions issued pursuant to § 1534(c) by the Office of Management and Budget ("OMB") explain that the intergovernmental exemption to FACA is sweeping in scope. Specifically, the exemption "applies to all Federal agencies subject to FACA" and to *"any* meetings called for any purpose relating to intergovernmental responsibilities or administration."[24] 60 Fed.Reg. 50,651, 50,653 (1995) (emphasis added). Thus, the exemption "is not limited to the intergovernmental consultations [regarding regulatory proposals containing significant Federal intergovernmental mandates,] but instead applies to the entire range of intergovernmental responsibilities or administration." *Id.* This broad construction of the exemption is "[i]n accordance with the legislative intent," which is "to facilitate intergovernmental communications on responsibilities or administration." *id.; see* H.R. Conf. Rep. 104–76, at 40 (March 13, 1995) ("an important part of efforts to improve the Federal regulatory process entails improved communications with State, local, and tribal governments"); *see also* 60 Fed.Reg. at 50,653 ("This exemption applies to meetings between Federal officials and employees and State, local, or tribal governments, acting through their

elected officers, officials, employees, and Washington representatives, at which 'views, information, or advice' are exchanged concerning the implementation of the intergovernmental responsibilities or administration, including those that arise explicitly or implicitly under statute, regulation, or Executive order").

Here, the intergovernmental exemption applies to all consultations previously conducted under the PA and now conducted pursuant to the HPP. *See* AR at 2832–33. First, all of the Consulting parties are within the class of parties described in the exemption: the Forest Service, Advisory Council, and the Federal Aviation Administration are Federal entities; the State Historic Preservation Officer is a State government official; the Big Horn County Commissioners are a local governmental entity; and the Coalition and Alliance have been designated by tribal governments to act on their behalf with respect to the Medicine Wheel.[25]

Second, the subjects of the consultations fall squarely within the language of the exemption and OMB's implementing regulations-the consultations on the new undertakings within the Area of Consultation to determine potential effects and means of mitigating such effects involve the "exchange of views, information, or advice relating to the management" of the Medicine Wheel by the Forest Service. *See* AR at 2620–26; 2 U.S.C. § 1534(b)(2). These consultations, as well as the consultations leading to the adoption of the HPP, fulfill the Forest Service's obligation under the

---

**24.** In addition to the exception to FACA, the Court notes that the National Historic Preservation Act explicitly authorizes programmatic agreements. *See* 36 U.S.C. 800.13(a)(3).

**25.** *See, e.g.,* AR at 772 (alliance request for consulting party status, signed by elders from various tribes); AR at 9188 (letter indicating that Northern Arapaho elders in Coalition represent and are authorized to act on behalf

of the Northern Arapaho Tribe); AR at 1172 (letter indicating that the Coalition represents Northern Cheyenne through tribal representatives to the Coalition); AR at 1786–87 (letter indicating that Alliance represents Fort Peck Tribes through tribal representatives to Alliance); AR at 2498 (Forest Service press release affirming that Alliance and Coalition represent tribal governments).

NHPA to consult with the other Federal, State, and local agencies and Indian tribes with respect to preservation-related activities. *See* 16 U.S.C. § 470h–2(a)(2). Therefore, this Court holds that NFS did not violate FACA by not allowing Sawmills to participate in consultations because the Consulting Parties were exempt from FACA requirements.

Accordingly, for the reasons stated above, the Court grants NFS's motion to dismiss. It is therefore

**ORDERED** that NFS's motion to dismiss is **PARTIALLY GRANTED.** It is further

**ORDERED** that NFS's motion for judgment on the merits of the remaining claims is **GRANTED.**

### *JUDGMENT*

This action came before the Court on pleadings, Honorable Alan B. Johnson, District Judge, presiding. The Court, having reviewed carefully the briefs of the parties, the applicable law, all matters of record, and being fully advised finds in favor of the defendant and defendant-intervener. It is,

**ORDERED, ADJUDGED AND DE-CREED** that plaintiff Wyoming Sawmills, recover nothing of the defendant United States Forest Service. It is further

**ORDERED, ADJUDGED AND DE-CREED** that defendant United States Forest Service, shall recover its costs, upon the filing of a bill of costs with the Clerk of the Court within ten (10) days of the date of entry of this Judgment. It is further

**ORDERED, ADJUDGED AND DE-CREED** that each party bear its own attorney's fees.